Martin G. BOLT, Sr.; Max R. Noel; Richard A. Koning, on behalf of themselves and others similarly situated, Petitioners/Plaintiffs/Appellants and Cross–Appellees,

v.

ARAPAHOE COUNTY SCHOOL DISTRICT NUMBER SIX, a/k/a Littleton Public Schools, Petitioner/Defendant/Appellee and Cross–Appellant,

and

Dain Bosworth Incorporated, Petitioner/Intervenor/Defendant.

NO. 94SC364.

Supreme Court of Colorado,
En Banc.

June 19, 1995.

Rehearing Denied July 31, 1995.

Kevin B. Pratt, Colorado Springs, for petitioners/plaintiffs/appellants and cross-appellees.

Banta, Hoyt, Greene & Everall, P.C., Stephen G. Everall, Richard J. Banta, Charles A. Kuechenmeister, Englewood, for petitioner/defendant/appellee and cross-appellant.

Kutak Rock, Cassandra G. Sasso, Michael R. Johnson, Craig N. Johnson, Denver, for petitioner/intervenor/defendant.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Merrill Shields, Deputy Atty. Gen., Richard Djokic, First Asst. Atty. Gen., Stephen G. Smith, Asst. Atty. Gen., Regulatory Law Section, Denver, for amicus curiae State of Colorado.

Maynes, Bradford, Shipps & Sheftel, Janice C. Sheftel, Durango, for amicus curiae Dolores Water Conservancy Dist.

Fairfield and Woods, P.C., Stephen H. Leonhardt, Craig A. Umbaugh, Brent A. Waite, Denver, for amicus curiae Southeastern Colorado Water Conservancy Dist.

Colorado Mun. League David W. Broadwell, Denver, for amicus curiae Colorado Mun. League.

Justice VOLLACK delivered the Opinion of the Court.

Plaintiffs/appellants Martin G. Bolt, Sr., et al. (the taxpayers), and defendant/cross-appellant the Arapahoe County School District Number Six, also known as the Littleton Public Schools (the school district), appeal an order of the Arapahoe County District Court (the district court) in Bolt, et al. v. Arapahoe County School District Number Six, No. 93CV185 (Dec. 13, 1993), which involved the taxpayers' challenge, under Colorado Constitution Article X, Section 20 (Amendment 1), to mill levy increases made by the school district in 1992 for use in 1993. The district court held that: (1) the school district's .771 mills increase in the bond redemption levy did not violate Amendment 1 and that in fact Amendment 1 impaired the bondholders' con-

tracts contrary to the contract clause of the United States Constitution, Article I, section 10(1); (2) the school district's 1.445 mills increase in the abatements and refunds levy was consistent with Amendment 1; and (3) the 2.000 mills levied by the school district for compliance with the Americans with Disabilities Act, 42 U.S.C. §§ 12101 to 12213 (Supp.1993) (ADA), and the Asbestos Hazard Emergency Response Act, 15 U.S.C. §§ 2641 to 2655 (1988 & Supp.1993) (AHERA), was in violation of Amendment 1.

We granted certiorari under C.A.R. 50,[1] and we now affirm the district court's judgment that the bond redemption levy and abatements and refunds levy did not violate the provisions of Amendment 1. However, we disagree with the district court that the ADA/AHERA levy was in contradiction to Amendment 1. We therefore affirm in part and reverse in part.

I.

On November 3, 1992, a majority of the voters in Colorado approved Amendment 1, an amendment to the Colorado Constitution which places limits on the ability of state government to tax and spend. The circumstances giving rise to the present controversy arose on December 15, 1992, when the school district certified the mill levy figures for 1993 to the Board of County Commissioners of Arapahoe County.[2] That certification represented an increase in the total mill levy from the previous year, of 4.160 mills.[3] The total mill levy which was certified in 1992 was comprised of a number of separate levy components, three of which are relevant here: the bond redemption mill levy, the abatements and refunds mill levy, and the ADA/AHERA mill levy.

A.

*The Bond Redemption Mill Levy*

On May 15, 1984, the school district received voter approval to issue $21,000,000 of

1. Under C.A.R. 50, the Supreme Court of Colorado may grant certiorari to review a case before the case has been decided by court of appeals.

2. The facts in this case are taken from the parties' factual stipulations and from the factual findings of the district court.

3. A "mill" is a unit representing one tenth of a cent, and is used to express the property tax rate per dollar of the assessed evaluation of that property. For example, a tax rate of 60 mills means that taxes are $0.06 per dollar of the assessed value of the property.

General Obligation Building Bonds, Series 1984B. Those bonds were issued by the school district on August 1, 1984. In addition to the 1984 general obligation bonds, the school district in 1984 issued $15,095,000 of General Obligation Refunding Bonds, Series 1984A, refunding previously issued and unmatured school district bonds.[4] Then, in 1985, the school district issued yet another series of General Obligation Refunding Bonds in the amount of $38,690,000 which refunded the 1984 building bonds and provided for repayment at a lower interest rate. The payment schedule for the 1985 refunding bonds provided for annual increases on repayment of debt principal and interest until 1998 and a slight decrease in 1999, when the bonds matured.

The Resolution authorizing the issuance of the 1985 refunding bonds provided for a pledge of general ad valorem taxes to be levied by the school district in an amount sufficient to make payments of interest and principal on the bonds as they became due.[5] The ad valorem taxes pledged in the Resolution were to be paid into the school district's Bond Redemption Fund and were reserved exclusively for the payment of bond principal and interest. In addition, the Resolution provided that the school district could use other available school district revenues to make those payments. In that event, under the Resolution, "the mill levy or levies herein provided [could] thereupon to that extent be diminished." A copy of the bond form incorporated within the Resolution also contained a certification and warranty that provision had been made

> for the levy and collection of a general ad valorem tax on all the taxable property within the School District, without limitation as to rate or amount, to the extent other funds are not made available for such payments, sufficient to pay the interest on and the principal of this Bond as the same respectively become due.

As it was authorized to do under the terms of the 1985 refunding bonds contract, the school district included within its 1992 mill levy certification a bond redemption levy of 8.365 mills, which represented a .771 mills increase from the previous year.[6] The school district did not seek voter approval of the 1992 bond redemption fund mill levy, and the property taxes were collected by the school district without advance voter approval.

### The Abatements and Refunds Levy

Each year, the County Assessor for Arapahoe County values the properties within the school district and notifies the property owners of their assessed property value. A property owner may challenge the assessor's valuation, as provided for in sections 39–5–122, 16B C.R.S. (1994); 39–8–106, –107, –108, 16B C.R.S. (1994); 39–10–114, 16B C.R.S. (1994); and 39–1–113, 16B C.R.S. (1994). If the property owner is ultimately successful in challenging the valuation, the County Assessor and the County Treasurer adjust the assessed value of the property to correct for the erroneous valuation. The County Trea-

---

4. As the district court found, a refunding bond pays off a previously issued bond, and does not create new debt.

5. Specifically, the Resolution provided as follows, in pertinent part:
 For the purpose of ... paying the interest on and the principal of the Bonds as the same become due and payable respectively, there shall be levied by the Board of County Commissioners of the County of Arapahoe, Colorado, on all of the taxable property in the District ... general ad valorem taxes in each of the years 1985 to 1998, inclusive, sufficient to make such reimbursement and pay the interest on and principal of the Bonds as the same become due and payable, respectively, to the extent other funds are not made available for such payments.

6. A school district has authority to issue bonds if the issuance has been approved by the voters. §§ 22–42–102, –114, 9 C.R.S. (1988 & 1994 Supp.). A school district may also levy taxes for the payment of the bonds. In fact, once a school district has issued bonds, the school district "shall" certify to the board of county commissioners "the amount needed for its bond redemption fund to pay all installments of principal and interest of said bonds." § 22–42–117(1), 9 C.R.S. (1988). Furthermore, the board then has a *duty* "to levy a tax on all the taxable property of said district at a rate sufficient to produce such amount ... for the purpose of paying bonds not yet due." § 22–42–118, 9 C.R.S. (1988 & 1994 Supp.).

surer then recalculates the amount of tax owed by the property owner using the corrected valuation, for each year in which the property owner was subject to the erroneous tax.

If the property owner paid the erroneous taxes, the County Treasurer refunds the amount of overpayment with interest. If the property owner did not pay the erroneous taxes, the County Treasurer prepares an amended tax bill and the amount of taxes erroneously billed is abated. At the time of the refund or abatement to the taxpayer, the County Treasurer must also adjust the amount of tax revenue to which the taxing governmental entity is entitled. In the case of a refund to the taxpayer, the proportionate amount of the refund attributable to that taxing entity (the school district in this case) offsets the amount of tax receipts collected by the school district in the year of the refund. In the case of an abatement, the proportionate amount of the abatement attributable to the school district reduces the amount of tax receipts in the year the decision on the challenge is final.

Pursuant to section 39–10–114(1)(a)(I)(B), 16B C.R.S. (1994), the County Assessor is required annually to certify to the school district its proportionate amount of the total amount of refunds and abatements granted. That section also requires a school district to add to its other revenue requirements, under the Public School Finance Act, an amount equal to the school district's proportionate amount of abatements and refunds granted. Section 39–10–114(1)(a)(I)(B) therefore requires the school district to include the revenue lost from abatements and refunds before setting its mill levy for that year. In this manner, the school district is able to collect revenues lost through previous years' abatements and refunds.[7]

On October 10, 1992, the County Assessor notified the school district of the value of taxable property within the boundaries of the school district and also notified the school district that the amount of abatements and refunds to be deducted from tax receipts for the previous year totaled $1,386,820.50. Adjusting for additional taxes received by the school district for omitted property, the net loss to the school district in 1992 was $1,281,281. To recoup this lost revenue, the school district, in its 1992 mill levy certification for 1993, set the abatements and refunds mill levy at 2.013 mills. That figure represented an increase in the abatements and refunds mill levy from the previous year of 1.445 mills. No voter approval was sought or obtained before the abatements and refunds taxes were levied.

### The ADA/AHERA Mill Levy

After the enactment of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 to 12213 (Supp.1993) (ADA), the school district determined that it was a "public entity" within the meaning of the ADA and proceeded to prepare a plan to comply with the requirements of the statute.[8] The school district identified those school properties which needed structural changes and estimated that it would have to spend approximately $1,932,800 to bring its school properties into compliance with the ADA.

The school district is also required to comply with the mandates of the Asbestos Hazard Emergency Response Act, 15 U.S.C. §§ 2641 to 2655 (1988 & Supp.1993), which require the school district to implement "response actions" to asbestos-related hazards in the schools. 15 U.S.C. § 2643(c), (d) (1988

7. Section 39–10–114(1)(a)(I)(B) was amended, effective April 27, 1994, but the relevant provisions in effect during 1991 remain unchanged.

8. The ADA prohibits public entities and private entities who operate public accommodations from discriminating against the disabled. Generally speaking, the ADA requires those entities to take reasonable steps to accommodate the needs of the disabled, including removing architectural barriers to entry by the disabled. See 42 U.S.C. §§ 12131(1)(A), 12181(7), 12182 (Supp.

1993). The ADA also provides penalties for noncompliance, including the availability of injunctive relief, damages, attorney fees, and costs. See 42 U.S.C. § 12133 (Supp.1993) (providing that the enforcement provisions of the ADA are the same as those found in 29 U.S.C. § 794a (1988), which in turn provides that the remedies, procedures, and rights available are the same as under 42 U.S.C. 2000e–16 (1988 & Supp.1993)); 42 U.S.C. § 12205 (Supp.1993) (attorney fees and costs).

& Supp.1994).[9] During the 1992–93 fiscal year, the school district expended $112,000 on AHERA compliance measures, and expected that it would incur another $1,121,000 from January 1994 through 1996.

The school district did not receive federal funding to assist with the necessary improvements, nor did it receive funding from the state specifically allocated for ADA or AHERA purposes. However, the school district received substantial state funding for deposit in its general fund. A portion of the state allocation was transferred to the school district's capital reserve fund, which was used by the school district to pay costs associated with ADA and AHERA compliance.

On June 16, 1992, the school district adopted a fiscal year 1992–93 budget, which imposed a two-mill levy for ADA/AHERA compliance.[10] Under section 22–40–109, 9 C.R.S. (1994 Supp.), the school district was authorized, but not required, to impose an additional property tax levy up to two mills in order to pay the costs of asbestos and hazardous materials removal and the costs of ADA compliance.[11] The ADA/AHERA mill levy was certified by the school district on December 15, 1992, and the tax was thereafter levied on the taxpayers. Again, the school district did not seek voter approval before implementing the ADA/AHERA levy.

### B.

On January 25, 1993, the taxpayers filed a class action suit against the school district alleging that the school district's total mill levy was illegal under Amendment 1 because the school district did not obtain advance voter approval for the increased taxes. In the complaint, the taxpayers alleged that they were owners of real property within the

boundaries of the school district, and that they adequately represented a class of taxpayers similarly situated. For relief, the taxpayers requested a declaration that the school district's levy was unconstitutional, and sought an injunction preventing the school district from further collecting and spending revenues which the taxpayers claimed were in violation of Amendment 1. The taxpayers asked for a refund of revenues illegally collected and for an award of reasonable attorney fees and costs.

In addition to denying the taxpayers' claims, the school district affirmatively alleged in its answer that the taxpayers had failed to join the bondholders as necessary parties. The school district thereafter filed a motion to join the bondholders, and one of the bondholders, Dain Bosworth Incorporated (Dain Bosworth), moved to intervene.

On June 9, 1993, the district court ruled on the various motions filed by the parties. First, the district court granted Dain Bosworth's motion to intervene, and held that all of the bondholders should be joined as defendants in the case if feasible. The district court reasoned that since one of the school district's claims was that Amendment 1 impaired the contracts of the bondholders, in violation of the United States Constitution Article 1, Section 10(1), the bondholders had an interest in the case that would not adequately be represented by the school district. The district court also certified the members of the plaintiff class to be "all owners of taxable property which is within the boundaries of [the school district] and which is subject to a mill levy tax for [the school district]." The district court certified the class under C.R.C.P. 23(b)(1) and 23(b)(2), and therefore did not require notice to all class members.[12]

---

9. The AHERA provides an enforcement penalty for noncompliance of up to $5,000 per day. 15 U.S.C. § 2647(a) (1988).

10. There was no ADA/AHERA mill levy for the previous year.

11. Section 22–40–109(1), 9 C.R.S. (1994 Supp.), provides in relevant part:

(1) For property tax years commencing on and after January 1, 1992, but before January 1, 1996, the board of education of any school district shall be authorized to make an additional

property tax levy of no more than two mills for the purpose of paying costs incurred by the district for asbestos and hazardous materials removal and for paying costs incurred by the district in complying with the federal "Americans with Disabilities Act of 1990", 42 U.S.C. sec. 12101 through 12213.

12. The taxpayers' claim that the school district also violated Colorado Constitution Article X, § 20(7)(c), which limits the amount of revenue a district may collect, was dismissed without prejudice by the district court on June 9, 1993. The

Prior to trial, the parties stipulated to the relevant facts concerning the abatement and refunds levy and the ADA/AHERA levy. The parties also filed several motions for summary judgment relating to the effective date of Amendment 1, the legality of the bond redemption mill levy, and the legality of the abatements and refunds mill levy. Shortly before trial, the district court granted the taxpayers' motion for partial summary judgment on the effective date of Amendment 1. The district court ruled that Amendment 1 became effective with the governor's proclamation on January 14, 1993, but that it applied "retrospectively" to the date as stated in the amendment.

Without ruling on the other motions for partial summary judgment the district court held a bench trial and entered its written order on December 13, 1993. The district court first held that the .771 mills increase in the bond redemption levy was not in violation of Colorado Constitution Article X, Section 20(4)(a), because the school district had voter approval in advance for the increase in taxes to pay for the bonded indebtedness.

Notwithstanding its holding that the bond redemption mill levy increase was legal under Amendment 1, the district court went on to find that the application of Amendment 1 to the bondholders resulted in an unconstitutional impairment of contract under Article I, Section 10, of the United States Constitution. The district court reasoned that Amendment 1 substantially impaired the security of the bondholders and impaired the school district's ability to pay its bonds by removing the school district's authority to unilaterally increase taxes. The district court further concluded that the impairment of the bond contracts caused by Amendment 1 was not necessary to accomplish the valid public purpose of restraining the growth of government. The court noted that the valid public purpose behind Amendment 1 would not be served if the result was a reduction in government services or a default in public indebtedness.

The district court also held that the 1.445 mills increase in the abatements and refunds mill levy was not contrary to Amendment 1, because the increase did not result in a net tax revenue gain for the school district under Colorado Constitution Article X, Section 20(4)(a).[13] The district court found that the language of Colorado Constitution Article X, Section 20(4)(a), referring to "a net tax revenue gain" was applicable to all of the preceding phrases in that section, and that therefore Amendment 1 did not require advance voter approval for a mill levy increase that did not result in a net revenue gain. The district court explained that its interpretation harmonized Amendment 1 with section 39-10-114, 16B C.R.S. (1994), which requires the school district to increase its abatements and refunds levy to recoup lost revenue. In addition, the district court concluded that the policy behind Amendment 1 was to "reasonably restrain ... the growth of government," emphasizing that restraining the growth of government did not mean reducing government.

The district court next found that the school district's two-mill levy for expenses relating to compliance with the ADA and the AHERA was unconstitutional under Colorado Constitution Article X, Section 20(4)(a), since it was both a new tax and a mill levy increase levied without voter approval. The district court ordered the school district to refund the amount of ADA/AHERA taxes collected, kept or spent, with interest, but did not order a specific method of refunding. Finally, the taxpayers were awarded costs and reasonable attorney fees.

After the district court issued its judgment in the case, the taxpayers became aware that the school district was intending to refund the ADA/AHERA funds by a tax credit pursuant to section 39-1-111.5(1), 16B C.R.S.

parties agree that this issue is not before the court.

**13.** Colorado Constitution Article X, § 20(4)(a), provides as follows:

**(4) Required elections.** Starting November 4, 1992, districts must have voter approval for: (a) ... any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change directly *causing a net tax revenue gain to any district.* (Emphasis added.)

(1994).[14] The taxpayers objected to the tax credit method of refunding the tax revenues and filed a motion to have the revenues refunded proportionately, with interest. The taxpayers argued that some members of the class who were property owners in 1993 and paid the illegal ADA/AHERA tax in 1993 were no longer property owners in 1994. Therefore, the taxpayers argued, the class members who were no longer owners of property within the boundaries of the school district could not take advantage of the tax credit and would not receive a refund.

After a hearing on the issue, the district court ruled that the school district could refund the illegal ADA/AHERA revenues by either of two methods, both of which the court deemed reasonable: a tax credit given to all owners of taxable property in the school district as of January 1, 1994, or a refund check mailed to all owners of taxable property as of January 1, 1993.[15] The taxpayers' later motion to alter or amend the judgment on the refund issue was denied, and both parties filed their notices of appeal. We then granted certiorari to review the legality of the school district's bond redemption levy, abatements and refunds levy, and ADA/AHERA levy under Amendment 1.

## II.

The school district first argues that the district court erred in determining the effective date of Colorado Constitution Article X, Section 20(4). The school district asserts that the date contained in Colorado Constitution Article X, Section 20(4), November 4, 1992, conflicts with Colorado Constitution Article V, Section 1(4), which states that all citizen-initiated or referred measures take effect when they are officially declared by proclamation of the governor. The school district submits that the effective date contained in Colorado Constitution Article V, Section 1(4), should prevail because it is more

specific and because Amendment 1 was not intended to amend or repeal Colorado Constitution Article V, section 1(4).

The governor issued his proclamation with respect to Amendment 1 on January 14, 1993. Under the school district's theory, then, the election provisions of Colorado Constitution Article X, section 20(4)(a), were not effective until after the school district certified its mill levy on December 15, 1992, and the school district was not therefore required to obtain advance voter approval for the 1992 mill levy.

■ We have recognized that, when construing a constitutional amendment like Amendment 1, our goal is to determine and give effect to the will of the people in adopting the measure. *Urbish v. Lamm,* 761 P.2d 756, 760 (Colo.1988). To accomplish this purpose, the terms in Amendment 1 should be given their ordinary and popular meaning. *Id.* Any interpretation which results in an unreasonable or absurd result should be avoided. *Bickel v. City of Boulder,* 885 P.2d 215, 229 (Colo.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1112, 130 L.Ed.2d 1076 (1995). In addition, a construction which harmonizes different constitutional provisions is favored over one that creates conflict between the provisions. *Id.* If more than one interpretation is supported by the language of the amendment, the favored interpretation is one which "reasonably restrain[s] most the growth of government." Colo. Const. art. X, § 20(1); *Bickel,* 885 P.2d at 229. Furthermore, Colorado Constitution Article X, section 20(1), provides that Amendment 1 "supersede[s] conflicting state constitutional, state statutory, charter or other state or local provisions." A conflict exists if one provision "authorizes what the other forbids or forbids what the other authorizes." *Bickel,* 885 P.2d at 228–29.

---

14. Section 39–1–111.5(1) provides as follows:
 (1) In order to effect a refund for any of the purposes set forth in section 20 of article X of the state constitution, any local government may approve and certify a temporary property tax credit or temporary mill levy rate reduction as set forth in this section. The procedures set forth in this section shall be deemed to be a

reasonable method for effecting refunds in accordance with section 20 of article X of the state constitution.

15. Additionally, the district court found that the school district would bear any processing costs incurred with the mailing of refund checks.

Colorado Constitution Article V, Section 1, reserves to the people the power of the initiative and referendum, and establishes the procedures under which those powers are implemented. One of the procedures provided for is the effective date of voter-approved initiatives or referenda. Under Colorado Constitution Article V, section 1(4), initiated and referred measures

> shall become the law or a part of the constitution, when approved by a majority of the votes cast thereon, and not otherwise, *and shall take effect from and after the date of the official declaration of the vote thereon by proclamation of the governor,* but not later than thirty days after the vote has been canvassed.

Colo. Const. art. V, § 1(4) (emphasis added). This portion of Colorado Constitution Article V, Section 1(4), therefore prescribes when initiatives and referenda become effective.

The particular provision of Amendment 1 which requires voter approval for increased or new taxes, Colo. Const. art. X, § 20(4)(a), states that elections are required starting November 4, 1992, the day after the general election approving the measure. That provision provides, in relevant part:

> (4) **Required elections.** *Starting November 4, 1992,* districts must have voter approval for: (a) ... any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change directly causing a net tax revenue gain to any district.

Colo. Const. art. X, § 20(4)(a) (emphasis added).

We agree with the district court that Colorado Constitution Article V, Section 1(4), and Colorado Constitution Article X, Section 20(4), are not in irreconcilable conflict. Under Colorado Constitution Article V, Section 1(4), voter-approved initiatives and referenda do not have the force of law until either the governor declares the measure official by proclamation, or, failing that, when thirty days have passed after the vote is canvassed.

In either case, the measure cannot carry the force of law under Colorado Constitution Article V, Section 1(4), until the vote approving the measure has been verified by the Secretary of State. *See* § 1–40–123, 1B C.R.S. (1994 Supp.) (providing that the Secretary of State, or other officer, "shall" transmit to the governor an "official certificate of election").[16]

Even though Amendment 1 could not have been effective as a law until after canvassing of the vote, nothing in Colorado Constitution Article V, Section 1(4), prevents Colorado Constitution Article X, Section 20, from specifying that once the vote has been confirmed, its provisions apply to conduct occurring after the actual vote on the measure but before the vote was officially validated. In other words, once Colorado Constitution Article X, Section 20(4), is made effective under Colorado Constitution Article V, Section 1(4), its terms can relate back to the conduct occurring the day after the election.

■ Although as a general rule a state constitutional amendment should only be applied prospectively, an amendment may be applied retrospectively if the terms of the amendment make it clear that a retrospective application was intended. *People v. Elliott,* 186 Colo. 65, 68, 525 P.2d 457, 458 (1974); *Santa Barbara County Taxpayers Ass'n v. County of Santa Barbara,* 194 Cal. App.3d 674, 681, 239 Cal.Rptr. 769, 773 (1987). In this instance, it is evident from the language of Colorado Constitution Article X, Section 20(4)(a), that the voters intended to require districts to seek voter approval beginning November 4, 1992. The voters could, and did, approve of a retroactive application of the election requirements contained in that section.

■ We find, accordingly, that Colorado Constitution Article X, Section 20(4)(a), formally became law under Colorado Constitution Article V, Section 1(4), after the vote was canvassed and when the governor issued his proclamation on January 14, 1993. We also conclude that the electorate intended

---

**16.** Section 1–40–123, 1B C.R.S. (1994 Supp.), is an amended version, effective May 4, 1993. The previously applicable provision, § 1–40–113, 1B C.R.S. (1980), is not for our purposes significantly different.

Colorado Constitution Article X, Section 20(4)(a), to apply retrospectively to districts as of November 4, 1992.[17]

### III.

Proceeding now to the merits of the case, the taxpayers argue that the district court erred by considering the validity of the separate components of the mill levy rather than treating the 1992 mill levy as a whole. The taxpayers assert that the 1992 mill levy is a single levy, and that the language of Colorado Constitution Article X, Section 20(4)(a), requires advance voter approval on the levy in its entirety before the levy can be imposed.[18] We disagree.

■ Under the taxpayers' theory, the entirety of every mill levy would be subject to voter approval, even if the mill levy represented only a slight increase over the previous year. We do not find support for this position in the text of Colorado Constitution Article X, Section 20(4)(a). It is evident to us that Colorado Constitution Article X, Section 20(4)(a), does not require the school district to obtain voter approval for every tax or mill levy, but only for those taxes which are either new or represent increases from the previous year. To the extent that the school district's 1992 mill levy was the same as the previous year, Colorado Constitution Article X, Section 20(4)(a), simply does not apply. Thus, in order to determine which portions of the 1992 mill levy are subject to voter approval, it is necessary to separately analyze the validity of the component parts of the levy. We conclude that the district court did not err in doing so.

### IV.

The taxpayers next argue that the school district's 1992 bond redemption mill levy increase of .771 mills was invalid because the school district did not receive advance voter approval for the increase under Colorado Constitution Article X, Section 20(4)(a). In the taxpayers' opinion, the district court erred in concluding that the voter-approval requirement of Colorado Constitution Article X, Section 20(4)(a), was met when initial issuance of the bonds was approved in the May 15, 1984, election. The taxpayers take the position that Amendment 1 requires express voter approval each time the school district wishes to raise the mill levy to pay interest and principal on the debt, and that the 1984 voter approval extended only to the creation of the bonded debt. Although we agree with the taxpayers that Colorado Constitution Article X, Section 20(4)(a), requires voter approval for both increased or new taxes and creation of new debt, we disagree that the school district failed to secure that voter approval.

In the May 15, 1984 election, the voters gave approval for the school district to issue $21,000,000 of general obligation bonds.[19] The ballot question submitted to the voters set forth that the proceeds from the bonds would be used to acquire new school buildings, or to make improvements and repairs of existing school buildings. The ballot issue also apprised the voters of the general terms of the bonds, including the amount of interest they would earn (11.50% per annum) and the date on which they would mature (twenty-five years from the date on the bond). As part of the voter approval to issue the bonds, the voters agreed that the bonded indebtedness would include "covenants, agreements, and details required or permitted by law as may later be determined by the Board." The ballot issue provided an open-ended

---

17. We offer no opinion as to the validity of other effective dates contained in Amendment 1, including the date contained in Colorado Constitution Article X, § 20(8), which purports to apply to income tax law changes before Amendment 1 was put to the voters.

18. Colorado Constitution Article X, § 20(4)(a), provides as follows:

> **(4) Required elections.** Starting November 4, 1992, districts must have voter approval for:
> (a) ... any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change directly causing a net tax revenue gain to any district.

(Emphasis added.)

19. As noted earlier, these bonds were refunded by the school district in 1985. The taxpayers agree that Amendment 1 does not require advance voter approval for the refunding.

mechanism for the school district to repay its bonded debt, the precise terms of which were delineated by the school district in its bond resolutions.

■ As we recognized in *Bickel v. City of Boulder*, 885 P.2d 215, 229–30 (Colo.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1112, 130 L.Ed.2d 1076 (1995), the incurment of debt and the repayment of that debt are issues that are so intertwined that they may properly be submitted to the voters as a single subject; they are "part and parcel of the same issue" under the Colorado Constitution, Colo. Const. art. XI, § 6. *Id.* We also noted in *Bickel* that voters may give present approval for future increases in taxes under Colorado Constitution Article X, Section 20(4)(a), when the increase might be necessary to repay "a specific, voter-approved debt." *Id.* at 234. We conclude that this is precisely what the voters did in 1984.

It is important in this case to remember that the notion contained in Colorado Constitution Article X, Section 20(4)—that voter approval is required for creation of debt and is also required for tax increases to pay that debt—was not part of our law in 1984 but was instead created by Amendment 1. In our view, the voters in 1984 could not have conceived of a requirement that they approve creation of bonded debt without also approving increased taxes to pay for the debt. There would have been no logical reason otherwise to require voter approval to take on the additional debt. *See Gude v. City of Lakewood*, 636 P.2d 691, 700 (Colo.1981) ("The public can never be overburdened by that which it is under no obligation to discharge, nor can the city become bankrupt by what it does not have to pay.") (quoting *Shields v. City of Loveland*, 74 Colo. 27, 32, 218 P. 913, 916 (1923)).

Indeed, other provisions in the Colorado Constitution which limit the amount of debt that the state or a political subdivision of the state can incur only apply to "debt" in the constitutional sense: debt that must be paid from future tax revenues. *See In re Interrogatories Concerning H.B. No. 1247*, 193 Colo. 298, 305, 566 P.2d 350, 355–56 (1977) (holding that H.B. 1247 did not constitute a debt in violation of Colorado Constitution Article XI, Section 3, which limits the state debt, because it did not pledge future state revenues nor did it create an obligation payable from general-purpose tax revenues); *Gude*, 636 P.2d at 697 (finding that Colorado Constitution Article XI, Section 6, requires voter approval for a local government's creation of general obligation debt, i.e., debt that the municipality is obligated to pay from its tax revenues). Since the only indebtedness subject to prior voter approval in 1984 was indebtedness that would be paid from tax revenues, it is logical to assume that the voters in 1984 intended to approve both the debt and the debt repayment mechanism approved by the school district.

The taxpayers argue that the voter approval could not have extended to mill levy increases because the ballot issue did not expressly and specifically provide for those increases. However, since we have concluded that the voters approved increased mill levies in 1984, before Amendment 1, we find that it would be unduly burdensome to also require the school district to prove that it complied with the technical requirements of Amendment 1 with respect to the specific language required when mill levy increases are put to a vote.[20] In our view, it is enough that the voters were aware that they were approving the creation of debt and the repayment of that debt, which we have concluded they did. *Cf. Nicholl v. E–470 Public Highway Auth.*, 896 P.2d 859, 869–70 (Colo.1995) ("Because the ballot strictures of Amendment 1 ... were not in place at the time of the election in 1988, we must assume that, when the voters authorized the Authority to levy the fee ... they also authorized the Authority to spend for that purpose whatever revenues it collected.").

---

20. *See* Colo. Const. art. X, § 20(3)(b) (providing for detailed voter notice of upcoming elections on tax or debt increases); *see also* Colo. Const. art. X, § 20(3)(c), requiring particular ballot language for tax increases:

Ballot titles for tax ... increases shall begin, "**SHALL (DISTRICT) TAXES BE IN-CREASED (first, or if phased in, final, full fiscal year dollar increase) ANNUALLY ...?**"

It is evident from the language of Amendment 1 that the voters wanted to reserve for themselves the decisions on whether to increase debt or increase taxes. With respect to the bond redemption mill levy, this purpose has been fulfilled because the voters approved the bonds. Since the bonded debt was approved with the understanding that the school district would be able to raise revenues to meet the bond obligations, we conclude that the school district had voter approval in advance for its bond redemption mill levy increases. Accordingly, the 1992 bond redemption mill levy did not violate Colorado Constitution Article X, Section 20(4)(a).[21] In light of our conclusion that the school district had advance voter approval for the bond redemption mill levy, we do not reach the school district's alternative argument that Amendment 1 is an unconstitutional impairment of the bond contracts under the United States Constitution, Article I, Section 10.

### V.

We next address the taxpayers' argument that the abatements and refunds levy certified by the school district violated Amendment 1 because it was levied without prior voter approval, and that section 39–10–114(1)(a)(I)(B), 16B C.R.S. (1994), which requires the school district to include abatements and refunds in its mill levy and does not provide for voter approval, is unconstitutional.[22] The taxpayers contend that the district court erred in interpreting Colorado Constitution Article X, Section 20(4)(a), to mean that the voter approval requirements of that section apply only if the mill levy increase results in a net tax revenue gain to

the school district. According to the taxpayers, subsection (4)(a) requires prior voter approval of the abatements and refunds mill levy since it was a mill levy "above that for the prior year."

Colorado Constitution Article X, Section 20(4)(a), requires advance voter approval for "any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change directly causing a net tax revenue gain to any district." For those issues on which a vote is required, Amendment 1 also contains election provisions providing for a series of election procedures. Colo. Const. art. X, § 20(3). First, the school district is required to send notices to all registered voters of the school district's intent to increase taxes or to increase debt in the upcoming election. Specifically the school district is required to send a notice with the following caption: "NOTICE OF ELECTION TO *INCREASE* TAXES/TO INCREASE DEBT/ON A CITIZEN PETITION/ON A REFERRED MEASURE." Colo. Const. art. X, § 20(3)(b) (emphasis added). In the case of a proposed tax increase, the school district is required to include in the notice the maximum dollar amount of each increase and the amount of district spending without the proposed increase. Colo. Const. art. X, § 20(3)(b)(iii). Additionally, Colorado Constitution art. X, § 20(3)(c) provides that

[b]allot titles for tax … *increases* shall begin, "SHALL (DISTRICT) TAXES BE *INCREASED* (first, or if phased in, fi-

---

**21.** Furthermore, since we have concluded that the 1992 bond redemption mill levy increase was proper under Amendment 1, we find no conflict between Amendment 1 and Colorado Constitution Article XI, § 6 (requiring local governments to arrange for debt repayment from taxes when debt is incurred), nor between Amendment 1 and § 22–42–117(1), 9 C.R.S. (1988) (requiring a school district to include in its mill levy certification the amount of taxes necessary to pay principal and interest on its bonds), § 22–42–118, 9 C.R.S. (1988 & 1994 Supp.) (requiring a levy of the bond redemption tax so certified), or § 22–42–128, 9 C.R.S. (1994 Supp.) (providing that bonded indebtedness approved by the voters pri-

or to Amendment 1 included the necessary voter approval under Colorado Constitution Article X, § 20(4), for increasing property tax mill levies to pay for the debt).

**22.** Specifically, the taxpayers argue that the there is no conflict between Colorado Constitution Article X, § 20(4)(a), and § 39–10–114(1)(a)(I)(B), but that Colorado Constitution Article X, § 20(4)(a), merely adds a voter-approval requirement to § 39–10–114(1)(a)(I)(B). In the alternative, the taxpayers assert that if there is a conflict, Colorado Constitution Article X, § 20(4)(a), is controlling.

nal, fiscal year dollar increase) ANNU-ALLY ...?"

(Emphasis added.)

 The overriding scheme of Amendment 1 with respect to taxes evidences an intent on the part of the voters to limit tax *increases* that do not receive prior voter approval. Even though the abatements and refunds mill levy was technically above that for the prior year, it operates merely to recoup lost revenue that, but for the assessor's errors, would have been collected from the property owners. For instance, if the school district knew before certifying its mill levy for the next year that the upcoming mill levy of "x" mills would fail to produce the anticipated revenue due to errors in the assessor's valuation of the property, the school district would adjust the mill levy accordingly to compensate for the shortfall. The abatements and refunds mill levy simply moves the adjustment to the following year or years, and does not operate as a tax increase.

We decline to adopt a rigid interpretation of Colorado Constitution Article X, Section 20(4)(a), which would have the effect of working a reduction in government services. The parties agree that the abatements and refunds levy allows the school district to recoup tax revenue that was lost because of an error in the assessment of the property. This mechanism is important because if the school district did not have the capacity to collect these lost revenues, it would most likely mean a shortfall in tax revenues for the school district in every year. The school district's ability to collect revenues which have already been budgeted and certified by the school district in the prior years would be thwarted, despite the fact that the mill levy does not increase the overall tax burden on the taxpayers.

 Furthermore, under Amendment 1 the school district is now required to include on the ballot title the "full fiscal year dollar increase" that would result from an ad valorem mill levy increase. Colo. Const. art. X, § 20(3)(c). The voters must approve the total amount of an ad valorem tax increase in dollars, and are not required by Amendment 1 to approve the mill levy *rate* used by the school district to collect that dollar amount.

Accordingly, any abatements and refunds mill levy that is levied to collect lost revenues from ad valorem tax levy increases in the previous year, having necessarily been approved by the voters, cannot be in violation of the voter-approval provision in Colorado Constitution Article X, Section 20(4)(a). The fact that the ad valorem tax levies which are the basis of the abatements and refunds mill levy in this case were not approved by the voters is not fatal, because this abatements and refunds mill levy was levied *to* recoup funds from ad valorem assessment errors prior to November 1992, well before Colorado Constitution Article X, Section 20(4)(a), was applicable.

 In sum, we agree with the district court that the school district's abatements and refunds mill levy was properly levied without voter approval and that it did not violate Colorado Constitution Article X, Section 20(4)(a). Therefore, section 39–10–114(1)(a)(I)(B), which requires the school district to include abatements and refunds in its mill levy, does not conflict with Colorado Constitution Article X, Section 20(4)(a), and is not unconstitutional.

## VI.

 The final component of the school district's 1992 mill levy that we are asked to review is the school district's imposition of a two mill levy for the purpose of complying with the ADA and the AHERA. The district court held that the school district illegally collected the ADA/AHERA tax because the tax was imposed without prior voter approval, in violation of Colorado Constitution Article X, Section 20(4)(a). We disagree. We find that the ADA/AHERA levy is not subject to the voter-approval provision of Colorado Constitution Article X, Section 20(4)(a) because the levy was effectively imposed prior to the effective date of that provision.

Our analysis begins with an overview of the statutory procedures under which the school district adopts its budget and collects the revenues necessary to meet its budget. The amount of a school district's levy in any year is driven by the district's budget. The school district board of education must adopt

the district's annual budget prior to the beginning of the upcoming fiscal year. § 22–44–110, 9 C.R.S. (1988 & 1994 Supp.).[23] Once the board of education has adopted the budget, "the board shall not review or change the budget," except in certain circumstances not applicable here. § 22–44–110(5), 9 C.R.S. (1988).[24]

No later than August 25 of each year, the assessor certifies to the secretary of each school district the "total valuation for assessment of all taxable property located within the territorial limits of each ... school district." § 39–5–128, 16B C.R.S. (1994). Then, no later than December 1, the state department of education certifies the number of mills to be levied to meet the district's share of equalization funding pursuant to the Public School Finance Act. § 22–53–114(2)(b.5), 9 C.R.S. (1992 Supp.). Based on this information,

> the board of education of each school district shall certify to the board of county commissioners of the county wherein said school district is located the separate amounts *necessary,* in the judgment of said board of education, to be raised from levies against the valuation for assessment of all taxable property located within the boundaries of said school district *for its general, bond redemption, transportation and special building funds to defray its expenditures therefrom during its then current fiscal year....*

§ 22–40–102(1), 9 C.R.S. (1994 Supp.) (emphasis added). Finally, no later than December 22, the board of county commissioners

shall, by an order to be entered in the record of its proceedings, levy against the valuation for assessment of all taxable property located in the county on the assessment date, and in the various towns, cities, school districts, and special districts within such county, the requisite property taxes for all purposes required by law. § 39–1–111(1), 16B C.R.S. (1994).

However, while this order entered by the board of county commissioners is the final event triggering imposition of a school district levy, this order is a purely ministerial act. The board of county commissioners has no authority to modify the school district's mill levy or to refuse to impose it. Section 22–40–103, 9 C.R.S. (1994 Supp.), provides:

> A board of education or a board of county commissioners shall not modify the amount certified pursuant to section 22–40–102 as needed for any calendar year, *nor shall said board of county commissioners be charged with any discretion in determining or reviewing the amounts so certified other than to ascertain if said amounts are within the limitations as prescribed by law.*

(Emphasis added.)

In *People ex rel. School District No. 2 v. County Commissioners,* 12 Colo. 89, 19 P. 892 (1888), we interpreted an earlier version of this statute and issued a writ of mandamus to compel the board of county commissioners to levy a special school tax certified to it by the board of education.[25] We rejected the board of county commissioners' argument that the assessment would raise more reve-

---

**23.** Effective in 1992, the fiscal year begins on July 1 of each year. § 22–44–102(4)(c).

**24.** Section 22–44–110(5) was amended effective April 7, 1994. § 22–44–110(5), 9 C.R.S.(1994 Supp.). The amended provision, which was not yet in effect during the events involved in this case, provides that the board may review and change its budget after the adoption of the budget, until September 30 of that year.

**25.** The provisions considered in *People ex rel. School District No. 2* were substantially similar to the provisions at issue here. Section 67 of the Colorado General Statutes provided:

> On or before the day designated by law for the commissioners of each county to levy the

requisite taxes for the then ensuing year, the school board in each district shall certify to the county commissioners the number of mills per dollar which it is necessary to levy on the taxable property of the district to raise a special fund for any of the purposes specified in section 51 of this chapter, and the county commissioners shall cause the same to be levied at the same time that other taxes are levied....

Section 70 provided:

> It shall not be lawful for a district of a district board to reconsider the question of the levy of a special tax after the same has been certified to the county commissioners, nor shall said commissioners be charged with any discretion in the matter of such levy, further than to ascertain if the law has been obeyed.

nue than was necessary for school purposes. *Id.* at 92, 19 P. at 894. We stated, "It is manifest that in the matter of levying the taxes the board of county commissioners act in a purely ministerial capacity as the agents of the state, and the board of education of the proper district is vested with the sole discretionary power in the premises." *Id.* at 93, 19 P. at 894. In reaching this conclusion, we emphasized "that it is the board of education, and not the county commissioners who really levy or cause taxes to be levied." *Id.; see also Lowden v. Board of County Comm'rs*, 101 Colo. 52, 55, 69 P.2d 779, 780 (1937).

■ The present statutory scheme compels the same result. Once the board of education has finalized the school district's annual budget, the amount necessary to meet the district's budget requirements determines the mill levy on the district's assessed valuation. The board of education has no discretion to certify a mill levy higher or lower than that necessary to meet the district budget, nor does the board of county commissioners have the power to modify the certified levy. Accordingly, for all intents and purposes the district levy is imposed when the district budget is adopted.

■ We recognize that section 22–40–103 allows the board of county commissioners to "review[ ] the amounts so certified ... to ascertain if said amounts are within the limitations as prescribed by law." However, that section gives the board of county commissioners authority to review only the *amount* of a levy, not to determine whether the school district levy otherwise was imposed lawfully. Even when the amount of a school district levy is excessive, where "the mill levy was not beyond legal limitation," we have held that the board of county commissioners may not refuse to impose the levy. *Lowden*, 101 Colo. at 54–55, 69 P.2d at 780; *see also People ex rel. Sch. Dist. No. 2*, 12 Colo. at 92–93, 19 P. at 892, 894.

In *Lowden*, we found that the Lincoln County school district "so 'loaded' the item for teachers salaries" that the levy certified by the district to the board of county commissioners constituted an abuse of discretion. *Lowden*, 101 Colo. at 54–55, 69 P.2d at 780.

While we found that the plaintiff taxpayers had a statutory cause of action for refund, we noted that the board of county commissioners nevertheless had been "powerless ... to avoid making levy in accordance with the school district's budget certificate." *Id.* Under *Lowden*, then, the board of county commissioners' discretion is limited to determining whether the amount of the levy exceeds the maximum number of mills allowed by statute.

■ Accordingly, the board of county commissioners has no authority to refuse to impose a levy certified by the school district because it violates Amendment 1. Amendment 1 does not limit the *amount* of the levy the school board may impose. Rather, it prescribes the *procedures* by which the levy may be increased.

In this case, section 22–40–109 authorized the board of education of any school district to

> make an additional property tax levy of no more than 2 mills for the purpose of paying costs incurred by the district for asbestos and hazardous materials removal and for paying costs incurred by the district in complying with the federal "Americans with Disabilities Act of 1990," 42 U.S.C. § 12101 through § 12213.

§ 22–40–109, 9 C.R.S. (1993 Supp.). Before adopting its budget, the Arapahoe County Board of Education published notice that it would be considering whether to add an additional two mills to the General Fund mill levy pursuant to section 22–40–109. On June 16, 1992, the Board adopted the 1992–93 budget which included expenditures to be funded by the additional mill levy. Therefore, its power to make further modifications to the budget expired on that date.

Based on the analysis set forth above, we find that the ADA/AHERA levy was imposed on June 16, 1992. Since Colorado Constitution Article X, Section 20(4)(a) applies only to new or increased taxes imposed on or after November 4, 1992, we hold that the voter-

approval requirements did not apply to this levy.[26]

## VII.

In conclusion, we find that Colorado Constitution Article X, Section 20(4)(a), became effective on the governor's proclamation under Colorado Constitution Article V, Section 1(4), and that it has retroactive effect to November 4, 1992, the date stated in Colorado Constitution Article X, Section 20(4). We also find that the school district's bond redemption levy, its abatements and refunds levy, and its ADA/AHERA levy did not violate the election provisions of Amendment 1. Accordingly, we affirm in part and reverse in part.

SCOTT, J., concurs in part and dissents in part.

ERICKSON, J., does not participate.

Justice SCOTT concurring in part and dissenting in part:

I agree with the majority's holding that the school district's bond redemption levy and its abatements and refunds levy did not violate the election provisions of Amendment 1. Colo. Const. art. X, § 20. I disagree, however, with the majority's holding that Amendment 1 does not apply to the district's ADA/AHERA mill levy. Accordingly, I respectfully dissent from part VI of the majority opinion.

The majority finds that "[t]he board of education has no discretion to certify a mill levy higher or lower than that necessary to meet the district budget, nor does the board of county commissioners have the power to modify the certified levy. Accordingly, for all intents and purposes the district levy is imposed when the budget is adopted." Maj. op. at 533. The majority then reasons that the 1992–93 budget was adopted on June 16, 1992, prior to November 15, 1992, the effective date of Amendment 1, and therefore "the levy was effectively imposed prior to the

effective date" of Amendment 1. Maj. op. at 532.

I disagree and conclude instead that a school tax is not imposed until after the county commissioners determine that the amount certified by the school board is "within the limitations as prescribed by law." Hence, I would find that the ADA/AHERA levy was not imposed until December 15, 1992, the date, well after the budgetary amounts required were certified by the school district, when the county commissioners, the only authority that can levy taxes, acted. Since I would find that the levy was imposed after the effective date of Amendment 1, I would hold that the tax was improperly imposed without prior voter approval, in violation of Colorado Constitution article X, section 20(4)(a).

## I

In order for the school district to collect the revenues necessary to meet its budget, the school district board of education must first adopt the district's annual budget prior to the beginning of the upcoming fiscal year. § 22–44–110, 9 C.R.S. (1988 & 1994 Supp.).[1] No later than August 25 of each year, the assessor certifies to the secretary of each school district the "total valuation for assessment of all taxable property located within the territorial limits of each ... school district." § 39–5–128, 16B C.R.S. (1994). Then, no later than December 1, the state department of education certifies the number of mills to be levied to meet the district's share of equalization funding pursuant to the Public School Finance Act, § 22–53–114(2)(b.5), 9 C.R.S. (1992 Supp.). Based on this information, the board of education of each school district certifies to the board of county commissioners "the separate amounts necessary, in the judgment of said board of education, to be raised from levies against the valuation for assessment of all taxable property located within the boundaries of

---

**26.** In light of our holding that the school district's ADA/AHERA levy was imposed prior to the effective date of Colorado Constitution Article X, Section 20(4)(a), we reverse the district court's award of attorney fees to the taxpayers. Additionally, we do not address the taxpayers' argu-

ment that the school district's proposed method of refunding that tax was unreasonable.

**1.** Effective in 1992, the fiscal year begins on July 1 of each year. § 22–44–102(4)(c).

said school district...." § 22–40–102(1), 9 C.R.S. (1994 Supp.). Finally, no later than December 22, the board of county commissioners:

shall, by an order to be entered in the record of its proceedings, *levy* against the valuation for assessment of all taxable property located in the county on the assessment date, and in the various towns, cities, school districts, and special districts within such county, the requisite property taxes for all purposes required by law.

§ 39–1–111(1), 16B C.R.S. (1994) (emphasis added).

I do not question the proposition that the board of education, not the board of county commissioners, is vested with authority over determining the actual amounts *certified* by it to the county commissioners. *See* § 22–40–103, 9 C.R.S. (1994 Supp.). The board of county commissioners, however, is granted the authority to review and approve the budgetary amounts certified as "within the limitations as prescribed by law." Section 22–40–103, 9 C.R.S. (1994 Supp.) states:

**Change in needed tax revenues—unlawful.** A board of education or board of county commissioners shall not modify the amount certified pursuant to section 22–40–102 as needed for any calendar year, nor shall said board of county commissioners be charged with any discretion in determining or reviewing the amounts so certified *other than to ascertain if said amounts are within the limitations as prescribed by law.*

(emphasis added). Contrary to the majority, I view this authority of the board of county commissioners to review and approve or disapprove the budgetary amounts certified as more than ministerial.[2] Surely, if the board of county commissioners determines that the amount certified by the school district is not "within the limitations as prescribed by law," then the board of county commissioners cannot impose the tax under section 22–40–103. My reading of the statute concludes, there-fore, that the board of county commissioners has the authority to find that the amounts certified do or do not comport with the law, including Amendment 1 and other constitutional prohibitions. Thus, the board of county commissioners may *levy* the appropriate tax or reject the same by refusing to effect the levy.

Amendment 1 imposes " 'limitations on the spending and taxing powers of state and local government.' " *Nicholl v. E–470 Pub. Highway Auth.,* 896 P.2d at 862–63 (Colo.1995) (quoting *Bickel v. City of Boulder,* 885 P.2d 215, 225 (Colo.1994)). Amendment 1 requires that, upon and after its effective date, any new or increased tax imposed by a district receive prior voter approval. Colo. Const. art. X, § 20(4)(a). From the taxpayers' perspective, a new or increased tax is imposed when the taxpayers are obligated to pay the tax, which occurs only after the board of county commissioners levies the tax. As noted by the majority, approval by the board of county commissioners is "the final event triggering imposition of a school district levy." Maj. op. at 533. The levy in this respect is not ministerial when considered in the context of Amendment 1—a tax increase is not a tax increase at all unless and until the taxpayers are obligated to pay the tax. Thus, although I concede that the school district's authority to alter the figures contained in the budget once the budget is adopted is restricted, I would find that under section 22–40–103, 9 C.R.S. (1994 Supp.), the budgeted tax is not actually levied until approved by the board of county commissioners.

## II

The school district's adoption of its budget in June of 1992 did not create the tax for the purposes of Amendment 1—rather, the ADA/AHERA levy was imposed when it was certified by the school district on December 15, 1992, and levied on the taxpayers. The

2. Amendment 1, by its terms, contemplates that it will be enforced by government officials as well as by citizens through the private right of action. *See Nicholl v. E–470 Pub. Highway Auth.,* 896 P.2d 859, 862 (Colo.1995). In fact, Amendment 1, when read together with § 22–40–103, creates an unmistakable obligation upon the board of county commissioners to assure that budget *amounts* certified by the board of education are within the taxing and spending limitations of Amendment 1.

ADA/AHERA mill levy was truly a tax increase under Amendment 1 because it raised new revenue for the purpose of meeting the requirements of the ADA and the AHERA. Since the mill levy was certified and imposed after the effective date of Amendment 1, it was subject to voter approval pursuant to Amendment 1. Thus, as the mill levy was not put to the voters, I would find that the school district's tax levy was in violation of Colorado Constitution article X, section 20(4)(a).

Accordingly, I must dissent from part VI of the majority opinion.