QUESTION PRESENTED AND CONCLUSION
Can the amount of state general fund revenues refunded through the temporary income tax credit granted by House Bill 96-100 be considered an expenditure, as defined in §24-77-102(4), C.R.S., for purposes of calculating state fiscal year spending for the fiscal year commencing July 1, 1996?
The state can provide the temporary tax credit granted by this bill. This bill specifically amends § 24-77-102(4), C.R.S. to include the refund of any revenues by the state which are not required by TABOR, including the granting of tax credits, within the definition of "expenditure" for calculating state fiscal year spending. It appears that the courts will approve this approach.
ANALYSIS
The state has revenues in excess of a statutory appropriation limit. It is prohibited from spending those revenues on general fund activities. The state has several options on how to use those revenues in other ways. It can, for example, use those excess revenues for capital construction. It can also refund those excess revenues through an income tax credit for the 1996 tax year. House Bill 96-1100 would allow the excess funds to be used for a tax refund through an income tax credit. This refund is clearly permissible. What is not clear is the impact on spending limits in future years.
The issue is that the bill also attempts to insure that the refund be counted as spending for TABOR purposes. Thus, the question is whether there is a legitimate distinction between a tax refund which is required by TABOR and one that is not required by TABOR. In this bill the General Assembly distinguishes between a tax refund that is voluntary and a tax refund that is required by TABOR. Whether a court would uphold this distinction is a vital issue because of the definition of fiscal year spending. If the H.B. 96-1100 tax refund is distinct from a TABOR refund then the state can count the monies it refunds as part of its fiscal year spending. If the tax refund is not distinct from a TABOR refund then the state cannot count the refunded monies as part of its fiscal year spending. The difficulty for the state is that if it chooses to treat the refund as an "expenditure" and counts the refund as part of its fiscal year spending under TABOR, a court could later determine that the refund was not an "expenditure" and should not have been counted as part of the state's fiscal year spending. Such disallowance could result in a recalculation and reduction of the next year's spending limit.
"Arveschoug-Bird," enacted in 1991, provides in relevant part:
 Except as otherwise provided for in subparagraphs (III) and (IV) of this paragraph (a), for the fiscal year of 1991-92 and each year thereafter, the total state general fund appropriations shall be limited to such moneys as are necessary for reappraisals of any class or classes of taxable property . . ., plus the lesser of:
 (A) An amount equal to five percent of Colorado personal income; or
 (B) six percent over the total state general fund appropriations for the previous fiscal year.
Section 24-75-201.1(1)(a)(II), C.R.S. (1994 Supp.).
Because the "Arveschoug-Bird limit" restricts state general fund appropriations, the state cannot appropriate any excess funds.[1] H.B. 96-1100 would allow a refunding of revenues in excess of the Arveschoug-Bird limit through a state income tax credit. Nothing in Arveschoug-Bird would prohibit such refunding; however, the question arises whether such refunding would be a district expenditure for TABOR purposes.
TABOR was proposed by initiative and was approved by the voters in the general election on November 3, 1992, as a limit on district revenue and spending. Subsection (2)(e) of TABOR defines "fiscal year spending" to mean "all district expenditures and reserve increases" with certain enumerated exceptions. TABOR is ambiguous in several areas and fails to define certain key words and phrases it uses. The General Assembly properly enacted legislation to provide a definition for words and phrases in TABOR which lacked clear meaning. Since the word "expenditure" was not defined by TABOR, in 1993 the General Assembly defined "expenditure" in § 24-77-102(4), C.R.S. as "the appropriation or disbursement of any state general fund or cash fund moneys for any expense incurred by the state."
One of TABOR's enumerated exceptions to "fiscal year spending" is "refunds made in the current or next fiscal year." Refunds are required in subsection (1) of TABOR for "[R]evenue collected, kept, or spent illegally." The clear intent of TABOR was to exclude any TABOR-required refund from being treated as fiscal year spending, and to assure that such refunds are not part of any district base. The refunds contemplated by H.B. 96-1100 are not refunds required by TABOR, and are not revenues "collected, kept, or spent illegally." It is not clear from TABOR whether any refund, or only TABOR-mandated refunds, are excluded from inclusion as fiscal year spending.
When the language of an amendment is plain, its meaning clear, and no absurdity involved, constitutional provisions must be declared and enforced as written. Colorado Ass'n ofPublic Employees v. Lamm, 677 P.2d 1350, 1353 (Colo. 1984).
Where ambiguities exist, a court should favor a construction that harmonizes different constitutional provisions rather than creates conflict. The court stated that:
 [W]e decline to adopt a rigid interpretation of Colorado Constitution Article X, Section 20(4)(a), which would have the effect of working a reduction in government services.
Bolt v. Arapahoe County Sch. Dist. No. Six, 898 P.2d 525,532 (Colo. 1995).
In enacting legislation, the General Assembly is authorized to resolve ambiguities in constitutional amendments in a manner consistent with the terms and underlying purposes of the constitutional provisions. See Submission ofInterrogatories on Senate Bill 93-74, 852 P.2d 1, 11 (Colo. 1993). The court, in an election case, indicated that it will require a good-faith test in reviewing compliance with article X, § 20. Bickel v. City of Boulder, 885 P.2d 215
(Colo. 1994).
The General Assembly has determined that there is an ambiguity and, by enacting H.B. 96-1100, has attempted to resolve that ambiguity by excluding only TABOR mandated refunds from fiscal year spending. No court has reviewed the definition of "expenditure" and whether the exclusion of refunds is limited to only TABOR-mandated refunds.
Statutes enacted by the General Assembly are presumed to be constitutional and are therefore entitled to deference by the courts. See Submission of Interrogatories onSenate Bill 93-74, 852 P.2d at 5 n. 4; see alsoFirelock, Inc. v. District Court, 776 P.2d 1090, 1097 (Colo. 1989).
CONCLUSION
The state can refund revenues in excess of the Arveschoug-Bird statutory limit through a state income tax credit. Current case law would support the General Assembly's authority to designate such refunded monies as an expenditure for TABOR purposes; however, there is no guarantee that a court would find that such refunds are different from refunds under TABOR. If the refunds cannot be counted as an expenditure, then the state's fiscal year spending would be incorrectly calculated, and could result in a reduction of the next year's spending limit.
 GALE A. NORTON Attorney General
 MERRILL SHIELDS Deputy Attorney General
ARVESCHOUQ-BIRD
STATE INCOME TAX CREDIT
TABOR
Colo. Const. art., X § 20(2)(e)
Section 24-77-102
Section 24-75-201
LEGISLATIVE BRANCH
House of Representatives
The state can refund revenues in excess of the Arveschoug-Bird statutory limit through a state income tax credit. Current case law would support the General Assembly's authority to designate such refunded monies as an expenditure for TABOR purposes; however, there is no guarantee that a court would find that such refunds are different from refunds under TABOR. If the refunds cannot be counted as an expenditure, then the state's fiscal year spending would be incorrectly calculated, and could result in a reduction of the next year's spending limit.
[1] The six percent limitation on appropriations does not apply to transfers from the General Fund to the Capital Construction Fund. The Capital Construction Fund statute was amended in 1986 to provide that transfers made from the General Fund to the Capital Construction Fund pursuant to that section "shall not be deemed to be appropriations subject to the limitations of §24-75-201.1." Section 24-75-302(2), C.R.S. (1994 Supp). This provision was effective in 1991, was not changed by the Arveschoug-Bird limit, and is still in effect. Thus, these transfers from the General Fund to the Capital Construction Fund are not subject to an Arveschoug-Bird limit.