## In re INTERROGATORIES RELATING TO the GREAT OUTDOORS COLORADO TRUST FUND.

### No. 95SA392.

Supreme Court of Colorado, En Banc.

March 25, 1996.

Timothy P. Daly, Chief Legal Advisor, Denver, for the Honorable Roy Romer, Governor of Colorado.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Merrill Shields, Deputy Attorney General, Richard Djokic, First Assistant Attorney General, Stephen G. Smith, Assistant Attorney General, Regulatory Law Section, Denver, for State of Colorado.

Douglas G. Brown, Rebecca C. Lennahan, John Roman Taylor, Denver, for Colorado General Assembly.

Sherman & Howard, L.L.C., Dee P. Wisor, Edmond F. Noel, Jr., Denver, for Great Outdoors Colorado Trust Fund.

David L. Harrison, Boulder, Pro Se.

Justice KOURLIS delivered the Opinion of the Court.

This matter comes before us pursuant to Article VI, Section 3, of the Constitution of the State of Colorado. Under the authority of that section, the Governor of the State of Colorado has propounded three interrogatories to this court that concern the interpretation of Amendment 8, now Article XXVII of the Constitution of the State of Colorado. The interrogatories are:

*Interrogatory No. One:*

Whether payments made pursuant to Colo.Rev.Stat. § 33–60–103(1)(c) (1993), and to a 1992 refunding of certain obligations of the state enumerated therein, which exceed the payments on obligations described in Article XXVII, Section (3)(1)(c), of the Colorado Constitution ("Amendment 8") originally due through November 30, 1998, are payable from the net proceeds of the Colorado lottery without violating Amendment 8.

*Interrogatory No. Two:*

Whether savings from the 1992 Refunding of certain obligations described in Amendment 8 can accrue to the benefit of the Capital Development Fund, instead of the Great Outdoors Colorado Trust Fund established by Amendment 8, without violating Amendment 8.[1]

*Interrogatory No. Three:*

Whether the last installment payment made under the contract between the State of Colorado and the City and County of Denver concerning the Colorado Convention Center, which was orig-

---

1. We take the reference to the Capital Development Fund to refer to the Capital Construction Fund created in § 24–75–302, 10B C.R.S. (1995 Supp.).

inally scheduled for July 1, 1993 and was postponed to September 1, 1993 pursuant to Colo.Rev.Stat. § 33–60–103(1)(b) (1993), violates Amendment 8.

We answer the first two interrogatories in the affirmative and uphold the constitutionality of section 33–60–103, 14 C.R.S. (1993 Supp.) (current version at section 33–60–103, 14 C.R.S. (1995)). We answer the third interrogatory in the negative, concluding that the last installment payment made on the Colorado Convention Center does not contravene Amendment 8.

I.

In 1980, the voters of the State of Colorado adopted an amendment to Article XVIII of the Colorado Constitution approving a state-supervised lottery. See H.R. Con. Res. 1007, 52d Leg., 1st Reg. Sess., 1979 Colo. Sess. Laws 1676–77. The amendment to article XVIII originally provided that net proceeds from the lottery would be allocated to the conservation trust fund for park, recreation, and open space purposes, unless otherwise provided by statute. Colo. Const. art. XVIII, § 2(7). The General Assembly then enacted a statute implementing this amendment in which it declared that 50% of net lottery proceeds were to be appropriated to capital construction costs for the state, 10% to the Division of Parks and Outdoor Recreation and 40% to the Conservation Trust Fund for distribution to local governments. § 24–35–210(4), 10 C.R.S. (1982) (current version at § 24–35–210, 10A C.R.S. (1995 Supp.)); ch. 100, sec. 1, § 24–35–210, 1982 Colo. Sess. Laws 371, 380–82.

In 1988, in the wake of significant increases in demand for prison beds, the General Assembly amended the lottery statutes to permit the game of lotto, and altered the funding formula to direct a portion of lottery proceeds to the construction of three named correctional facilities, as well as "such other correctional facilities as shall be designated by the general assembly." § 24–35–210(4)(f)(D), 10A C.R.S. (1988) (current version at § 24–35–210, 10A C.R.S. (1995 Supp.)); ch. 178, sec. 3, § 24–35–210(4), 1988

Colo. Sess. Laws 940, 943. As a result of the change in the funding formula, beginning in 1989, the relative shares of lottery proceeds going to the Division of Parks and Outdoor Recreation and to the Conservation Trust Fund began to decrease.

In November of 1992, the voters adopted the Great Outdoors Colorado Amendment (Amendment 8), which provides that net lottery proceeds, including those from lotto, can only be used for the "preservation, protection, enhancement and management of the state's wildlife, park, river, trail and open space heritage...." Colo. Const. art. XXVII, § 1(1). Amendment 8 thereby created the Great Outdoors Colorado Trust Fund (Trust Fund), to which the lottery proceeds are to be allocated.

However, Amendment 8 also recognized that certain lottery proceeds had already been dedicated to capital construction projects and that those commitments should be honored. The text of the Amendment therefore permits for payment of identified obligations, providing that the payments are to be made within the "window" period of September 1, 1993, through November 30, 1998. Colo. Const. art. XXVII, § 3(1)(a)(II).

Prior to passage of Amendment 8, the state had financed various lottery-related capital construction projects through the issuance of certificates of participation (COPs). COPs were sold to investors and proceeds were used to pay the construction costs of the projects. The state then entered into lease-purchase agreements with the COP holders, who held title to the projects, and paid rent for the use of the properties. This rent money was ultimately used to pay principal and interest on the COPs, which would eventually result in the state holding title to the properties when the debt payments were completed.

In October of 1992, prior to the November adoption of Amendment 8, the Capital Finance Corporation[2] refinanced a number of the COPs because of a reduction in interest

---

**2.** The Capital Finance Corporation is the non-profit corporation organized to act as lessor of

the properties under § 24–82–703, 10B C.R.S. (1988) (amended 1993).

rates.[3] Through this action, the state was able to pay a lower interest rate while reducing the principal in a shorter period of time. The refinancing, or refunding, included the Series 1979 Certificates, the Series 1986 Certificates, the Series 1988 Certificates and the Refunded Series 1989 Certificates, all of which are listed obligations described in subsection (1)(c) of section 3 of Amendment 8. Pursuant to the 1992 refunding, some principal amounts previously due after November 30, 1998 were converted into debt service due prior to November 30, 1998 and as a result the amount due during the "window" rose from $163,323,746.14 to $169,921,223.14.[4]

In 1993, the General Assembly enacted section 33–60–103, 14 C.R.S. (1995). Ch. 327, sec. 1, § 33–60–103, 1993 Colo. Sess. Laws 2019, 2020–23. This statute implements Amendment 8 in part by delineating a payment schedule for the capital construction obligations listed therein. The schedule identified by the statute incorporates the 1992 refunding of the obligations. § 33–60–103(1)(c), 14 C.R.S. (1995).

The interrogatories posed to us by the Governor raise three issues, the first two of which are interrelated. Issue one requests a determination as to whether Amendment 8 permits payments made pursuant to the 1992 refunding as contemplated by the statute. Issue two inquires about the appropriate disposition of the savings resulting from the 1992 refunding. Issue three addresses the last payment made on the Colorado Convention Center and whether it was untimely under Amendment 8.

## II.

There is no dispute among the various parties that the obligations that were subject to the refunding are, in part, the same obligations as those enumerated in section 3(1)(c) of Amendment 8. Therefore, we are not dealing with whether the purpose of the pay-

ments was proper, but instead with whether the amount of the payments made from lottery proceeds toward the refunded debt under section 33–60–103 is authorized under the terms of Amendment 8.

The applicable language of Amendment 8 provides that the state treasurer shall distribute net lottery proceeds:

(II) to the State's Capital Construction Fund for payment of debt service due from and including September 1, 1993, to and including November 30, 1998, on the obligations described in Subsection (1)(c) of this Section 3, but *only to the extent such debt service is due during such period according to the terms of the documents originating such obligations,* and only if such debt service has not been prepaid or other moneys have not been dedicated or set aside for such debt service payments as of January 1, 1992, or thereafter; *provided, however, that such obligations may be refunded and debt service* from and including September 1, 1993, or the date of such refunding, if later, *on any such refunding obligation shall be payable from Net Proceeds,* even if payable after November 30, 1998, *to the extent the debt service on such refunding obligation does not exceed the total amount of debt service payable* on the applicable refunded obligation from and including September 1, 1993, or from the date of such refunding, if later, to and including November 30, 1998, *according to the terms of the documents originating the applicable refunded obligation* . . . .

Colo. Const. art. XXVII, § 3(1)(a)(II) (emphasis added).

In a parallel manner, the language of section 33–60–103 also requires the state treasurer to make distributions from lottery proceeds to the capital construction projects listed in section 3(1)(c) of Amendment 8.[5] The statute provides:

The people intend that debt service on the following obligations shall continue to be payable from Lottery Program Net Proceeds to the extent allowed in Section 3(1)(a) above:

(A) State of Colorado Certificates of Deposit (1979); Wheat Ridge, Colorado Project, in the original principal amount of $6,895,000 (Issue A); Pueblo, Colorado Project, in the original

---

**3.** This refunding of obligations will hereinafter be referred to as the "1992 refunding."

**4.** This figure is taken from Attorney General's opinion. 91 Op. Att'y Gen. 4 (1994). There is some disagreement among the parties as to the exact figures, but these appear generally correct.

**5.** Section 3(1)(c)(I) reads:

(4) Pursuant to Amendment XXVII of the state constitution, the sum of all distributions of net lottery proceeds made to the capital construction fund from the fourth quarter of fiscal year 1992–93 through the fourth quarter of fiscal year 1997–98 shall include *payment in full of all debt service due from and including September 1, 1993, to and including November 30, 1998,* on all obligations set forth in section 3(1)(c) of article XXVII of the state constitution.

§ 33–60–103(4), 14 C.R.S. (1995) (emphasis added). However, the statute differs from Amendment 8 in one significant respect: the statute specifically states that payment will be made on the 1992 refunding of the debts. § 33–60–103(1)(c), 14 C.R.S. (1995).

The Great Outdoors Colorado Trust Fund and the Attorney General of the state of Colorado argue that payments pursuant to the 1992 refunding mandated by section 33–60–103(4) are unconstitutional to the extent they exceed the obligations which were extant during the "window" as of January 1, 1992. The Colorado General Assembly responds by asserting that the statute represents a reasonable resolution of ambiguities in the amendment and should be upheld. For the reasons set forth below, we adopt the position asserted by the Colorado General Assembly.

### A.

As an initial matter, we note that a court's duty in interpreting a constitutional amendment is to give effect to the will of the people adopting such amendment. *In re Interrogatories Propounded by Senate Concerning House Bill 1078,* 189 Colo. 1, 7, 536 P.2d 308, 313 (1975). When the language of an amendment is plain, its meaning clear, and no absurdity involved, constitutional provisions must be declared and enforced as written. *Colorado Ass'n of Public Employees v. Lamm,* 677 P.2d 1350, 1353 (Colo. 1984).

However, where ambiguities exist, a court should favor a construction that harmonizes different constitutional provisions rather than creates conflict. *Bolt v. Arapahoe County Sch. Dist. No. Six,* 898 P.2d 525, 532 (Colo.1995). Where possible, courts should adopt a construction of a constitutional provision in keeping with that given by coordinate branches of government. *Watrous v. Golden Chamber of Commerce,* 121 Colo. 521, 546, 218 P.2d 498, 510 (1950).

We find the language of Amendment 8 to be ambiguous in several significant respects. The most troublesome is the lack of clear meaning of the key phrases "documents originating the obligations" and "documents originating the applicable refunded obligation." These phrases are used in section 3(1)(a)(II) of Amendment 8 to define the amount payable on a debt during the "window" and thus are integral to a determination of whether the higher payments required by the 1992 refunding are constitutional.

One interpretation of these phrases is by reference to the documents creating the original debts. Under such a reading, section 3(1)(a) would be internally inconsistent with section 3(1)(c)(I), which lists specific obligations that had already been refunded years before Amendment 8 had been written. Also, this interpretation would provide no basis to distinguish the 1992 refunding from any refunding that had occurred five or ten years prior to the Amendment. In addition, the retroactive impact of the Amendment would be pervasive in vitiating all refundings. Such a reading also could not be harmonized

---

principal amount of $5,320,000 (Issue B); Grand Junction, Colorado Project in the original principal amount of $4,735,000 (Issue C);

(B) Original principal amount of $36,495,-000 Colorado Health Facilities Authority Certificates of Deposit (1986) (Youth Services, Developmental Disabilities Projects);

(C) Original principal amount of $36,000,-000 Colorado Convention Center Contract with the City and County of Denver (1987);

(D) Original principal amount of $63,025,-000 State of Colorado Certificates of Deposit (1988) Master Lease Purchase Agreement (Correctional Facilities Project);

(E) Original principal amount of $66,894,-861.85 State of Colorado Certificates of Deposit (1989) Master Lease Purchase Agreement (Various Projects); and

(F) Original principal amount of $28,635,-000 State of Colorado Certificates of Deposit (1990) Master Lease Purchase Agreement (Additional Projects).

Colo. Const. art. XXVII, § 3(1)(c)(I).

with the portion of section 3(1)(a)(II) that anticipates and validates the concept of refunding.

Another interpretation of these phrases relies on the phrase in Amendment 8 which states: "Except to the extent allowed in Section 3(1)(a) above for refunding obligations, debt service on obligations originated on or after January 1, 1992, shall not be payable from Net Proceeds." Colo. Const. art. XXVII, § 3(1)(c)(II). The Attorney General and the Great Outdoors Colorado Trust Fund claim that this provision limits all debt payments to those that existed on January 1 of 1992. In arguing this, they are essentially claiming that the phrases "documents originating the obligations" and "documents originating the applicable refunded obligation" refer to the documented debts as they existed on January 1, 1992. If that were the intent of the Amendment, the language would merely need to have referred to the "obligations" as they existed on January 1, 1992. The use of the term "documents *originating* the obligations" (emphasis added) interjects the concept of the origin of the obligation, not merely its status as of January 1, 1992. Therefore, a clearer interpretation of this provision would be that no capital construction projects initiated after January 1, 1992, were to be financed out of lottery proceeds. Section 3(1)(a)(II) itself also provides no assistance in interpreting the reference to January 1, 1992. Instead, the section is silent as to the effect the Amendment is intended to have on refundings that pre-date its adoption.

■ In enacting legislation, the General Assembly is authorized to resolve ambiguities in constitutional amendments in a manner consistent with the terms and underlying purposes of the constitutional provisions. *See Submission of Interrogatories on Senate Bill 93-74,* 852 P.2d 1, 11 (Colo.1993). By enacting section 33–60–103, the General Assembly has interpreted the original obligations listed in Amendment 8 as incorporating the 1992 refunding. This interpretation is a reasonable and permissible resolution of the ambiguities created by the language of the Amendment. Section 33–60–103 is consistent with the terms and purposes of Amendment 8, to wit: the net lottery proceeds are directed to the Great Outdoors Colorado Trust Fund, with a portion of the proceeds being used for a period of five years for capital construction debts. Application of section 33–60–103 also takes into consideration the changes wrought by the 1992 refunding and avoids any conflict with the status of the obligations as they existed on the date of the Amendment's adoption. In addition, by treating the 1992 refunded debts as the original debts referred to in the Amendment, the General Assembly's interpretation supports the general principle of law that a refunded debt replaces the original debt. 64 Am.Jur.2d, *Public Securities and Obligations* § 261 (1972).

B.

In addition to being a reasonable and permissible interpretation of Amendment 8, section 33–60–103 also comports with significant rules of statutory construction, while the interpretation set forth by the Attorney General and the Great Outdoors Colorado Trust Fund do not.

■ Retroactive application of laws is highly disfavored; unless the terms of the amendment clearly show an intent to make it retrospective in operation, it is presumed that a constitutional amendment will be given only prospective application. *Bolt v. Arapahoe County Sch. Dist. No. Six,* 898 P.2d 525, 533 (Colo.1995); *People v. Elliott,* 186 Colo. 65, 68, 525 P.2d 457, 458 (1974). In *Bolt,* this court examined Article X, Section 20(4)(a) of the Colorado Constitution. This section reads as follows: "(4) **Required elections.** Starting November 4, 1992, district must have voter approval for: (a) . . . any new tax . . . or a tax policy change directly causing a net tax revenue gain to any district." Colo. Const. art X, § 20(4)(a). Because the language gives a clear starting date of November 4, 1992, this court found that the electorate intended a retroactive application of the amendment to November 4, 1992. *Bolt,* 898 P.2d at 533. Unlike the amendment considered in *Bolt,* the text and format of Amendment 8 are ambiguous and lack a clear mandate to apply the Amendment retroactively.

An additional problem with interpreting the phrases as referring to the debts as they existed on January 1, 1992, is that after the 1992 refunding, the obligations listed in section 3(1)(c)(I) changed and not all remained in existence. Specifically, a part of the Auraria portion of the 1989 COPs was refunded, and the 1979, 1986, and 1988 COPs were rolled into the 1992 refunding and were superseded.

■ A court's interpretation of a constitutional amendment is constrained by consideration of the state of things existing at the time the provision was framed and adopted. *Krutka v. Spinuzzi,* 153 Colo. 115, 124, 384 P.2d 928, 933 (1963). The altered status of the obligations listed in section 3(1)(c)(I) as of the Amendment's adoption in November 1992 argues strongly against applying the interpretation advocated by the Attorney General and the Great Outdoors Colorado Trust Fund.

■ Finally, statutes enacted by the General Assembly are presumed to be constitutional and are therefore entitled to deference by the courts. *See Submission of Interrogatories on Senate Bill 93–74,* 852 P.2d at 5 n. 4; *see also Firelock, Inc. v. District Court,* 776 P.2d 1090, 1097 (Colo.1989). The party challenging the constitutionality of an act bears the burden of proving its unconstitutionality beyond a reasonable doubt. *Id.; People v. Riley,* 708 P.2d 1359, 1362 (Colo. 1985); *People v. Schoondermark,* 699 P.2d 411, 415 (Colo.1985).

■ While the Attorney General and the Great Outdoors Colorado Trust Fund set forth some reasonable arguments, they fail to meet their burden of proving the unconstitutionality of the statutory interpretation of Amendment 8 in section 33–60–103 beyond a reasonable doubt. The ambiguous language of the Amendment does not clearly comport with the interpretation that they present. When courts construe a constitutional amendment that has been adopted through a ballot initiative, any intent of the proponents that is not adequately expressed in the language of the measure will not govern the court's construction of the amendment. *See*

*In re Proposed Initiative on Water Rights,* 877 P.2d 321, 327 (Colo.1994).

Thus, we conclude that payments made pursuant to section 33–60–103(1)(c) on the 1992 refunding of certain obligations of the state may be paid from net proceeds of the Colorado lottery as delineated in that statute without violating article XXVII of the state constitution.

### III.

■ The second interrogatory concerns whether the savings achieved by the state in the 1992 refunding appropriately go to the Great Outdoors Colorado Trust Fund or whether they may accrue to the benefit of the capital construction fund. To address this question we must understand the nature of the savings which this interrogatory contemplates.

By virtue of our answer to interrogatory number one, we ratify the legislative interpretation of the Amendment whereby payments will continue to be made on the 1992 refunded obligations. Therefore, the second interrogatory addresses the money that will ultimately be saved through the 1992 refunding of the obligations listed in section 3(1)(c)(I). The ultimate savings occur in the form of shorter debt service obligation periods.

The 1992 refunding accomplished two goals: 1) it reduced the interest rate on various debts; and 2) it accelerated the payment of principal. The net effect was that the payments due during the "window" period are greater than they were preceding the refunding, but the total amount of principal and interest payments spread over the life of the obligations is lower. The savings in this case will therefore exist in the form of monies that will no longer be required to be paid out as a result of an overall decrease in debt payments.

The Amendment is silent on the issue of any savings achieved by a refunding of obligations. The statute is similarly silent. The Great Outdoors Colorado Trust Fund and the Attorney General argue that, if payments are to be made on the refunded obligations at all, the Trust Fund should be the beneficiary

of any savings generated through that refinancing.[6] The General Assembly argues that the taxpayers of the state, who paid the costs of the refunding and whose representatives, acting through the Capital Finance Corporation, had responsibility for negotiating and consummating the refinancing, should be the beneficiaries.

The gravamen of this question turns on whether the monies that, as a result of the 1992 refunding, are no longer required to be paid out were originally to be paid from lottery proceeds or from general taxpayer dollars. Under the terms of Amendment 8, any unspent lottery proceeds must go to the Trust Fund.[7]

But if the money no longer required to be spent on the capital construction debts was not originally to be paid from lottery proceeds, then there is no reason for the benefit to apply to the Trust Fund. To do so would, in effect, necessitate a transfer of money from the capital construction fund, or general fund, to the Trust Fund.[8] There is no basis for such action since there is no language in the amendment or the statute that directs ultimate savings accomplished by refunding of debts to be paid from either the capital construction fund or the general fund to the Trust Fund. Thus, any unspent taxpayer dollars or money from the general fund may appropriately accrue to the capital construction fund.

Our analysis shows that the 1992 refunding will not result in any lottery proceeds set aside for the capital construction debts remaining unspent. Amendment 8 provides a formula from which to determine the highest total amount of lottery proceeds allowed to be applied toward capital construction debts during the window. It does not set aside a specific dollar amount to be paid on the obligations. Under the payment schedule outlined by section 33–60–103, the payments to be made during the window match the highest amounts allowed to be paid.[9] Thus, there are no lottery proceeds that were originally earmarked for capital construction debts that are not being used for that purpose. Instead, any interest that will no longer be required to be paid out as a result of the 1992 refunding will be in the form of money from the general tax fund that, if not for the 1992 refunding, would have had to have been used to pay the remaining obligations on these capital construction projects.

Therefore, we answer interrogatory number two by concluding that savings resulting from the 1992 refunding of certain obligations of the state described in Article XXVII of the Colorado Constitution do not accrue to the Trust Fund but instead may accrue to the benefit of the capital construction fund.

## IV.

We turn lastly to the issue concerning the propriety of the Colorado Convention Center payment. The debt on the Colorado Conven-

6. To the extent that the Trust Fund and the Attorney General argue that money should have been applied from the capital construction fund to debt service during the "window" period in order to reduce lottery proceed expenditure to the level required prior to the 1992 refunding, we have resolved this argument in part II of the opinion.

7. Amendment 8 provides that net proceeds of every state-supervised lottery game operated under the authority of Article XXVII, § 2, shall be allocated to the preservation, protection, enhancement and management of the state's wildlife, park, river, trail and open space heritage. The concession to the capital construction obligations was included in the Amendment in order to give deference to the state's preexisting obligations, and to allow a "window" of time within which to phase out the use of lottery proceeds for capital construction projects. Hence, the opera-

8. The General Assembly funds the capital construction fund with revenue from the general fund. § 24–75–302, 10B C.R.S. (1995 Supp.). Thus, money taken from the capital construction fund is essentially taken from the general fund.

9. If the effect of § 33–60–103 had been to require payments during the window of a total amount lower than the ceiling, the result would have been that less lottery money than originally earmarked would have had to have been used to pay off the capital construction debts. Any lottery proceeds not used to pay off the capital construction debts would have gone directly to the Trust Fund.

tion Center is listed in section 3(1)(c)(I) as one of the capital construction obligations to which lottery proceeds are to be allocated during the "window." The confusion arises because the final payment on the Convention Center debt was originally due July 1, 1993, which would have occurred before the starting date of the permissible payment "window." The General Assembly delayed the due date of the payment until September 1, 1993, in order for it to fall within the "window" created by Amendment 8. § 33–60–103(1)(b), 14 C.R.S. (1995). The question is whether that delayed payment was permitted by the terms of Amendment 8.

■ Two rules of statutory construction direct the answer to this interrogatory. First, in interpreting the language of a constitutional amendment, courts should give effect to the intent of the people who adopted the provision. *Urbish v. Lamm,* 761 P.2d 756, 760 (Colo.1988). Second, in construing constitutional language, each clause and sentence must be presumed to have purpose and use. *Reale v. Board of Real Estate Appraisers,* 880 P.2d 1205, 1208 (Colo.1994).

In reading Amendment 8, debt due on the Colorado Convention Center Contract is clearly listed as one of the six capital construction obligations to which lottery proceeds will be directed. *See supra* p. 537–38 n. 5. The payment schedule on the Convention Center Contract is not included in the text of the Amendment. Thus, it is likely that voters were unaware that the final payment on the Convention Center Contract was due before September 1, 1993, and that as a result, technically none of the Convention Center debt fell within the acceptable "window." Instead, the text of Amendment 8 would lead a reasonable reader to believe that some lottery proceeds would be going towards the Convention Center debt.

■ To interpret Amendment 8 differently and exclude any payments to the Convention Center would render section 3(1)(c)(I)(C) meaningless. Courts must lean in favor of a construction that will render every word operative, rather than one that may make some words idle and nugatory. *Lamborn v. Bell,* 18 Colo. 346, 352, 32 P. 989, 991 (1893); *see*

*also City of Aurora v. Acosta,* 892 P.2d 264, 267 (Colo.1995).

■ Hence, since technical construction should not be applied so as to defeat the objectives sought to be accomplished by the voters, *see Cooper Motors, Inc. v. Board of County Comm'rs,* 131 Colo. 78, 83, 279 P.2d 685, 688 (1955), we hold constitutional the General Assembly's action in delaying the final payment on the Convention Center Contract so that it would fall within the window delineated by Amendment 8.

## V.

On the basis of the conclusions set out in this opinion, we respond to the Interrogatories submitted to us as follows:

*Interrogatory No. One:*

Yes, payment of the 1992 refunded obligations pursuant to section 33–60–103, 14 C.R.S. (1993 Supp.) (current version at section 33–60–103, 14 C.R.S. (1995)), is constitutional.

*Interrogatory No. Two:*

Yes, savings generated by reason of the 1992 refunding can accrue to the Capital Development Fund.

*Interrogatory No. Three:*

No, the last installment payment on the Colorado Convention Center did not violate Amendment 8.

LOHR, J., concurs in part and dissents in part, and SCOTT, J., joins in the concurrence and dissent.

Justice LOHR concurring in part and dissenting in part:

The resolution of the interrogatories submitted to this court by the governor requires the interpretation of the allocation provisions of Amendment 8, now Article XXVII of the Colorado Constitution. The majority finds ambiguity in these provisions and accepts the interpretation proffered by the General Assembly. As a result, the majority answers Interrogatories Nos. One and Two in the affirmative and Interrogatory No. Three in the negative.

I disagree with the majority's finding of ambiguity. I read the provisions of Amend-

ment 8 to include a clear and unambiguous prohibition on the use of lottery proceeds to make the excess payments of debt service on capital construction obligations referred to in Interrogatory No. One. I would therefore answer Interrogatory No. One in the negative. I also read Amendment 8 to prohibit with equal clarity the payment of the last installment on the Colorado Convention Center contract from lottery proceeds. I would therefore answer Interrogatory No. Three in the affirmative. The majority's answers to the first and third interrogatories, in my opinion, validate the legislative diversion of lottery proceeds intended for wildlife, park, river, trail, and open space purposes to payments for capital construction obligations, a result that I would hold to be constitutionally impermissible under Amendment 8.

Interrogatory No. Two relates to the use of savings from the refunding of certain obligations described in Amendment 8. The plain language of Amendment 8 does not require the allocation of all refunding savings to wildlife, park, river, trail, and open space purposes. Accordingly, although our reasons for reaching this conclusion differ, I concur in the majority's determination that Interrogatory No. Two should be answered in the affirmative.

I therefore concur as to the majority's resolution of Interrogatory No. Two and dissent as to the majority's resolution of Interrogatories Nos. One and Three.

## I.

A brief review of the history of the Great Outdoors Colorado Amendment (Amendment 8), now codified at article XXVII of the Colorado Constitution, will aid in understanding the issues presented by the governor. I shall postpone a detailed discussion of the relevant provisions until my analysis of the issues raised by the individual interrogatories in parts II, III, and IV.

Colorado voters authorized the establishment of a state-supervised lottery program in 1980 by approving an amendment to article XVIII, section 2, of the Colorado Constitution. This amendment dedicated the net lottery proceeds to the state conservation trust fund "for distribution to municipalities and counties for park, recreation, and open space purposes," unless otherwise provided by statute. Colo. Const. art. XVIII, § 2(7). In 1982, the General Assembly established a lottery system and provided by statute for the allocation of the proceeds to the Conservation Trust Fund (40%), the Division of Parks and Outdoor Recreation (10%), and the Capital Construction Fund (50%), the latter of which provides funds for capital construction costs incurred by the state. Ch. 100, sec. 1, § 24–35–210(4), 1982 Colo. Sess. Laws 371, 381 (currently codified as amended at § 24–35–210, 10A C.R.S. (1988 & 1995 Supp.)).

In 1988, the General Assembly made two significant changes to the lottery system. First, the General Assembly amended the lottery statutes to allow the game of lotto. Second, the General Assembly altered the funding formula to direct a portion of lottery proceeds to the construction of state correctional facilities. Ch. 178, sec. 3, § 24–35–210(4)(a), (f)(I), 1988 Colo. Sess. Laws 940, 941, 943 (currently codified as amended at § 24–35–210, 10A C.R.S. (1995 Supp.)). This alteration in the funding formula decreased the relative share of the lottery proceeds allocated to park, recreation, and open space purposes.

Based on concerns that the state's park, recreation, and open space resources were underfunded and that the people's original intent to dedicate the lottery proceeds to those purposes was not being followed, a group of Colorado citizens drafted Amendment 8 and secured its placement on the 1992 ballot. *See Submission of Interrogatories on Senate Bill 93–74*, 852 P.2d 1, 8 (Colo.1993) ("With specific exceptions, Amendment 8 ... dedicates the net proceeds of the state-supervised lottery to specific purposes because of the perception that the General Assembly had diverted net lottery proceeds away from the original purposes of the lottery to capital construction.") (citing Legislative Council of the Colorado General Assembly, *An Analysis of 1992 Ballot Proposals* 41 (1992)). Amendment 8 was adopted by the voters in November of 1992 and became article XXVII of the Colorado Constitution. The amendment re-

structured the funding formula to ensure the future, permanent dedication of all lottery proceeds "to the preservation, protection, enhancement and management of the state's wildlife, park, river, trail and open space heritage," Colo. Const. art. XXVII, § 1(1), and created the Great Outdoors Colorado Trust Fund (GOCO Fund) to manage a significant portion of these funds.

Amendment 8, however, did not provide for the immediate transfer of all lottery proceeds to wildlife, park, river, trail, and open space purposes. In recognition of the state's existing practice of paying certain capital construction obligations from lottery proceeds, the amendment established a five-year "window," from September 1, 1993, through and including November 30, 1998, during which the state could continue to pay certain identified obligations from lottery monies, subject to additional restrictions set forth in the amendment. This allocation format allowed the state time to find alternate funding sources for these obligations but strictly limited the ability of the state to divert additional lottery proceeds away from wildlife, park, river, trail, and open space purposes. *See Submission on Senate Bill 93–74*, 852 P.2d at 4 (intent of Amendment 8 was to " 'ensure that [lottery proceeds] ... will be returned to parks and outdoor recreation as ... originally intended' ") (quoting *Analysis of 1992 Ballot Proposals, supra,* at 41).

The capital construction obligations potentially eligible for repayment from lottery proceeds under Amendment 8 were originally financed through issuance of certificates of participation (COPs).[1] In October of 1992,

following the drafting and publication of Amendment 8 but one month prior to its adoption, the state completed a refunding of several of these COPs (the 1992 refunding). This refunding accomplished both a reduction in interest rates on the obligations and an acceleration of certain future principal payments that were to become due after the closing of the "window" so that these payments would become due during the "window" period and could be repaid from lottery proceeds. For the purposes of the issues before us, the relevant result of the 1992 refunding was a $6,597,477.00 increase in the amount of debt service payable with lottery proceeds, from $163,323,746.14 prior to the refunding to $169,921,223.14 pursuant to the terms of the refunding.[2]

In 1993, the General Assembly enacted section 33–60–103, 14 C.R.S. (1995), as the implementing statute for Amendment 8. Ch. 327, sec. 1, § 33–60–103, 1993 Colo. Sess. Laws 2019, 2020–23. In subsection 103(1)(c), the General Assembly delineated a payment schedule for the obligations identified in Amendment 8 that incorporates the terms of the 1992 refunding, and thus requires payment from lottery proceeds of the additional $6,597,477.00 in debt service shifted into the "window" as a result of the refunding. Furthermore, in subsection 103(1)(b), the General Assembly authorized the delay of the $6,000,000 final payment on the Colorado Convention Center obligation, one of the obligations listed in Amendment 8, *see* Colo. Const. art. XXVII, § 3(1)(c)(I)(C), until September 1, 1993. Because the final payment on this obligation was originally due on July

---

**1.** The state sold certificates of participation (COPs) to investors to finance the original construction costs of the projects. These COPs are structured in the form of lease/purchase arrangements. The COPs, however, do not create a legal obligation on the part of the state to make payments to certificate holders and do not pledge any specific source of revenue for repayment. Instead, the relevant state entity must make an annual decision to appropriate monies for debt service on the COPs. *See generally Glennon Heights, Inc. v. Central Bank & Trust,* 658 P.2d 872, 878–79 (Colo.1983) (nonbinding debt structure is necessary to comply with prohibition in article XI, section 3, of the Colorado Constitution against the state contracting certain debts). Therefore, Amendment 8's limitation on the use

of lottery proceeds to repay these obligations does not directly affect the relationship between the COP purchasers and the state.

**2.** The parties do not agree as to the exact debt service values. To avoid unnecessary confusion, I have adopted the same pre- and post-refunding debt service values used by the majority, maj. op. at 541 n.4, which were calculated by the Attorney General's office, 91 Op. Att'y Gen. 4 (1994), and derived the difference between the two values through simple subtraction. However, under my resolution of the issues before us, it would be necessary to determine the exact amount of debt service payable from lottery proceeds both prior to and pursuant to the terms of the 1992 refunding.

1, 1993, the delay authorized by the statute allowed the payment to be made within the "window," *see supra* p. 536, and thus to be paid with lottery proceeds.

## II.

The first interrogatory requires the interpretation of the allocation provisions of Amendment 8 to determine whether they prohibit the use of lottery proceeds as authorized in section 33–60–103, 14 C.R.S. (1995).[3] In construing a constitutional amendment, this court must ascertain and give effect to the intent of those who adopted it. *Urbish v. Lamm,* 761 P.2d 756, 760 (Colo.1988). "Where the language of the Constitution is plain and its meaning clear, that language must be declared and enforced as written." *Colorado Ass'n of Pub. Employees v. Lamm,* 677 P.2d 1350, 1353 (Colo.1984) (citations omitted). Because I find no ambiguity in Amendment 8 regarding the first issue before us, I would enforce the plain meaning of the amendment and hold that its provisions prevent the payment from lottery proceeds of debt service on obligations created by the 1992 refunding and authorized in section 33–60–103(1)(c), 14 C.R.S. (1995), to the extent that such payments exceed the total debt service limit defined in Amendment 8.

## A.

Section 3 of article XXVII of the Colorado Constitution governs the allocation of all state lottery proceeds, net of prizes and various other operating expenses.[4] Through the fourth quarter of the 1997–98 fiscal year, section 3 provides that each of the following entities receives a portion of these lottery proceeds: the Conservation Trust Fund (pursuant to § 24–35–210(4)(b), 10A C.R.S. (1995 Supp.)), the Division of Parks and Outdoor Recreation (pursuant to § 24–35–210(4)(c), 10A C.R.S. (1995 Supp.)), the Capital Construction Fund (for payment of debt service on specified capital construction obligations pursuant to section 3 of Amendment 8), and the Board of the Great Outdoors Colorado Trust Fund (all remaining sums, in trust). At issue in Interrogatory No. One is whether the repayment schedule for capital construction obligations set by the General Assembly in section 33–60–103(1)(c), 14 C.R.S. (1995), violates the provisions of Amendment 8 governing the amount of lottery proceeds allocable to the Capital Construction Fund.

Section 3(1)(a)(II) of Amendment 8 specifically defines and limits the amount of lottery proceeds available for the repayment of debt service due on state capital construction obligations. In pertinent part, this provision states that net proceeds are allotted

to the State's Capital Construction Fund for payment of debt service due from and including September 1, 1993, to and including November 30, 1998, on the obligations described in Subsection (1)(c) of this Section 3, but only to the extent such debt service is due during such period according to the terms of the documents originating such obligations ...; provided, however, that such obligations may be refunded and debt service from and including September 1, 1993, or the date of such refunding, if later, on any such refunding obligation shall be payable from Net Proceeds, even if payable after November 30, 1998, to the extent the debt service on such refunding obligation does not exceed the total amount of debt service payable on the applicable refunded obligation from and including September 1, 1993, or from the date of such refunding, if later, to and including November 30, 1998, according to

3. Interrogatory No. One was submitted in the following form:

Whether payments made pursuant to Colo.Rev. Stat. § 33–60–103(1)(c) (1993), and to a 1992 refunding of certain obligations of the state enumerated therein, which exceed the payments on obligations described in Article XXVII, Section [3](1)(c), of the Colorado Constitution ("Amendment 8") originally due through November 30, 1998, are payable from the net proceeds of the Colorado lottery without violating Amendment 8.

4. Section 3(1) provides a precise definition of "Net Proceeds"—*i.e.,* those proceeds eligible for distribution pursuant to the remainder of section 3. Colo. Const. art. XXVII, § 3(1). Future references to lottery proceeds in this concurrence and dissent are to "Net Proceeds" as defined in section 3, article XXVII.

the terms of the documents originating the applicable refunded obligation....

Colo. Const. art. XXVII, § 3(1)(a)(II).

This provision provides a clear and unambiguous statement of the rules governing the allocation of lottery proceeds to debt service on capital construction projects. The first portion of the above provision[5] controls the application of lottery proceeds to capital construction obligations in the absence of any refunding of the obligations. The obligations potentially eligible for payment with lottery proceeds are limited to six obligations existing prior to the drafting of Amendment 8 and specifically identified in section 3(1)(c)(I).[6] Moreover, the provision allows payment of debt service on these obligations from lottery proceeds only to the extent that these payments are due within a five-year "window," from and including September 1, 1993, to and including November 30, 1998. Colo. Const. art. XXVII, § 3(1)(a)(II). To allow calculation of the amount of these obligations payable during the "window," the provision adopts as a baseline the "terms of the documents originating such obligations." As the provision addresses only the obligations individually identified in section 3(1)(c)(I), this phrase can only be reasonably read to refer to the documents that originated the obligations as they are listed in that subsection. Whether a listed obligation has been the subject of a prior refunding is not relevant to this reading, because only the current obligation, not the original refunded obligation, is identified by name in section 3(1)(c)(I).

This plain reading of Amendment 8 is consistent with both the policy underlying the amendment and the legal principles relating to the refunding process. Amendment 8 was intended to direct the bulk of lottery proceeds to preserve the state's wildlife, park, river, trail and open space heritage. The amendment makes concessions for the payment of certain preexisting capital construction obligations from lottery proceeds, but payments may be made only on those obligations specifically identified in section 3(1)(c)(I). The amendment references the originating documents to define this limited group of potentially eligible obligations and to ensure that these obligations could not be expanded at the expense of open space programs. Furthermore, as the majority recognizes, a refunded debt is a new obligation, created at the time of the refunding, that replaces the original debt. Maj. op. at 539 (citing 64 Am.Jur.2d, *Public Securities and Obligations* § 261 (1972)). Accordingly, obligations created by refunding have their own sets of originating documents, and the above reading creates no inconsistency relating to the presence of both refunding and nonrefunded obligations in section 3(1)(c)(I). Although the majority posits several inventive interpretations of the reference to "originating documents," maj. op. at 539, its inexplicable failure to discuss the above facial interpretation, despite its presence in the briefs of both the General Assembly and the GOCO Board, suggests a search for ambiguity where none exists. *Cf. Colorado State Civil*

---

**5.** When I discuss the "first portion" of section 3(1)(a)(II), I am referring to that portion of the provision, as quoted above, that precedes the semi-colon and ends with the phrase "documents originating such obligations...."

**6.** Section 3(1)(c)(I) reads as follows:

The people intend that debt service on the following obligations shall continue to be payable from Lottery Program Net Proceeds to the extent allowed in Section 3(1)(a) above:

(A) State of Colorado Certificates of Deposit (1979); Wheat Ridge, Colorado Project, in the original principal amount of $6,895,000 (Issue A); Pueblo, Colorado Project, in the original principal amount of $5,320,000 (Issue B); Grand Junction, Colorado Project in the original principal amount of $4,735,000 (Issue C);

(B) Original principal amount of $36,495,000 Colorado Health Facilities Authority Certificates of Deposit (1986) (Youth Services, Developmental Disabilities Projects);

(C) Original principal amount of $36,000,000 Colorado Convention Center Contract with the City and County of Denver (1987);

(D) Original principal amount of $63,025,000 State of Colorado Certificates of Deposit (1988) Master Lease Purchase Agreement (Correctional Facilities Project);

(E) Original principal amount of $66,894,861.85 State of Colorado Certificates of Deposit (1989) Master Lease Purchase Agreement (Various Projects); and

(F) Original principal amount of $28,635,000 State of Colorado Certificates of Deposit (1990) Master Lease Purchase Agreement (Additional Projects).

Colo. Const. art. XXVII, § 3(1)(c)(I).

*Serv. Employees Ass'n. v. Love,* 167 Colo. 436, 445, 448 P.2d 624, 627 (1968) (where words and phrases have a plain and ordinary meaning, court should not resort to forced and strained definitions). I would apply the plain meaning of these provisions. *See Dempsey v. Romer,* 825 P.2d 44, 51 (Colo. 1992) ("[I]f language of a constitutional provision conveys a clear and definite meaning involving no absurdity or internal contradiction, any construction of such language must give full effect to that meaning.") (citations omitted).

The second portion of section 3(1)(a)(II) [7] permits the refunding of the obligations listed in section 3(1)(c)(I), but only subject to specific restrictions. These obligations may be refunded, and new obligations payable from lottery proceeds created, with the following exception: debt service payable from lottery proceeds under the obligation created by refunding cannot exceed the amount of debt service that would have been payable during the "window" period, or the part of that period remaining on the date of the refunding, according to the terms of the documents originating the applicable refunded obligation. Colo. Const. art. XXVII, § 3(1)(a)(II). As explained above, *supra* pp. 546, the reference to originating documents refers to the documents that created the obligations as they are listed in section 3(1)(c)(I). Thus, the provision creates a cap on the amount of debt service payable within the "window" period, and the cap amount is determined by reference to the documents originating those listed obligations being refunded.

The majority expresses concern that the provisions of Amendment 8, regardless of how they are read, provide no guidance concerning a refunding, such as the 1992 refunding, completed between the drafting of Amendment 8 and its adoption by the voters. *See* maj. op. at 538–39. This concern is misplaced, however, for the amendment's plain language encompasses such interim refundings, and the refunding restrictions in section 3(1)(a)(II) are applicable to the 1992 refunding. Amendment 8 provides for re-

payment of only certain specified obligations from lottery proceeds and restricts payment and refunding based on the originating documents for these listed obligations. Although the 1992 refunding altered the form of certain of these named obligations, the refunding did not result in a redrafting of the language of the amendment to include these new obligations. Thus, the obligations as listed in section 3(1)(c)(I) remain the only obligations payable under Amendment 8 and the originating documents for those named obligations remain the baseline by which the amount of total debt service payable from lottery proceeds is to be calculated.

Because the 1992 refunding obligations were not drafted into the amendment as obligations directly payable from lottery proceeds, they cannot qualify for repayment under Amendment 8 except to the extent that they meet the restrictions on refundings of the listed obligations. Thus, notwithstanding the timing of the 1992 refunding, the refunding obligations it created are not payable from lottery proceeds under Amendment 8 unless they were created in compliance with the refunding restrictions in section 3(1)(a), including the cap on total debt service payable from lottery proceeds. The language of section 3(1)(c)(II), which states that "[e]xcept to the extent allowed in Section 3(1)(a) above for refunding obligations, debt service on obligations originated on or after January 1, 1992, shall not be payable from Net Proceeds," Colo. Const. art. XXVII, § 3(1)(c)(II), further supports this interpretation. Section 3(1)(c)(II) explicitly prevents the use of lottery proceeds for payment of new debt obligations originated after January 1, 1992, including new obligations created by refunding, unless the new obligations comply with the refunding restrictions in section 3(1)(a). Thus, the obligations created by the 1992 refunding, which did not originate until October of 1992, are not payable from lottery proceeds to the extent that they violate the restrictions in section 3(1)(a). To interpret these provisions otherwise would endorse the legislature's revision of capital construction project funding schedules in a manner in-

---

7. By the "second portion" of section 3(1)(a)(II), I mean that portion of the provision, quoted *supra*

p. 546, that follows the semi-colon and begins with the word "provided."

tended to be prevented by Amendment 8. *See Submission on Senate Bill 93–74*, 852 P.2d at 4, 8.

## B.

Having discerned the plain and unambiguous meaning of the allocation provisions of Amendment 8, the next analytical step requires application of these provisions to determine the validity of the 1992 refunding and the repayment provisions of section 33–60–103(1)(c), 14 C.R.S. (1995). The majority correctly notes that statutes enacted by the General Assembly are generally presumed to be constitutional. Maj. op. at 539–40 (citing *Submission on Senate Bill 93–74*, 852 P.2d at 5 n. 4; *Firelock v. District Court*, 776 P.2d 1090, 1097 (Colo.1989)). However, where a statute conflicts with the clear language of the constitution, the constitution is paramount and it is the duty of the General Assembly to obey the constitutional mandate. *People in Interest of Y.D.M.*, 197 Colo. 403, 407, 593 P.2d 1356, 1359 (1979); *Civil Serv. Employees Ass'n.*, 167 Colo. at 448, 448 P.2d at 628–29. I would hold section 33–60–103(1)(c), 14 C.R.S. (1995), to be in conflict with the plain meaning of Amendment 8, and thus unconstitutional, to the extent that it authorizes payment of debt service from lottery proceeds on the 1992 refunding obligations in excess of the debt service payable during the "window" under the documents originating the refunded obligations as listed in section 3(1)(c)(I) of Amendment 8.

The state finalized the transaction described as the 1992 refunding in October of 1992, approximately one month prior to the November 1992 adoption of Amendment 8 by the voters. This refinancing altered two elements of the affected obligations. First, the state secured a reduced interest rate on the refinanced obligations. Second, the state accelerated payment of portions of the principal on these obligations into the "window" period identified in the then-pending Amendment 8. Consequently, following the 1992 refunding, certain principal amounts previously due after November 30, 1998, were rescheduled for payment as debt service prior to that date. Although the constitutionality of this action is at issue today, the immediate result of this acceleration was to increase the amount of debt service due during the "window," with a corresponding increase in the amount of debt service payable from lottery proceeds and decrease in the lottery proceeds allocated to the GOCO Fund. Specifically, the Attorney General calculated the amount of debt service due before the 1992 refunding to be $163,323,746.14. Subsequent to the 1992 refunding, the amount of debt service due during the "window" rose to $169,921,223.14, an increase in debt service payable from lottery proceeds of $6,597,477.00.

In 1993, following the passage of Amendment 8, the General Assembly enacted section 33–60–103, 14 C.R.S. (1995). Ch. 327, sec. 1, § 33–60–103, 1993 Colo. Sess. Laws 2019, 2020–23. As the implementation statute for Amendment 8, section 33–60–103 was the mechanism used by the General Assembly to create a payment schedule for the capital construction obligations listed in the amendment. Rather than creating a payment schedule based on the original terms of the obligations listed in Amendment 8, however, the statutory payment schedule incorporates the terms of the 1992 refunding. § 33–60–103(1)(c), 14 C.R.S. (1995). Therefore, the statute requires the payment from lottery proceeds of the additional $6,597,477.00 in debt service that became payable within the "window" solely as a result of the 1992 refunding. This excess charge to lottery proceeds directly conflicts with the cap on total debt service set forth in section 3(1)(a)(II) of Amendment 8.

As discussed in part II(A), *supra*, section 3(1)(a)(II) of Amendment 8 places a specific limitation on the state's ability to refund the obligations payable with lottery proceeds under the amendment. Debt service on refunding obligations is payable from net lottery proceeds during the "window," *but only to the extent that it does not exceed the debt service payable on the refunded obligations during that same time period*. Colo. Const. art. XXVII, § 3(1)(a)(II). Thus, the state's ability to refund and restructure its obligations under Amendment 8, assuming that payment on the obligations from lottery proceeds is "allowed" under sections 3(1)(a) and

3(1)(c), is constrained only by a cap on the amount of total debt service payable from lottery proceeds, inclusive of all of the obligations identified in section 3(1)(c)(I), within the "window." Based on the documents originating the listed obligations, as mandated by the language of Amendment 8, the debt service cap amount has been calculated to be $163,323,746.14. *See supra* note 2. Section 33–60–103(1)(c) requires the payment of $169,921,223.14 from lottery proceeds for capital construction obligations, an excess of $6,597,477.00 over the constitutional debt service cap. Accordingly, the General Assembly's repayment schedule violates the refunding restrictions set forth in Amendment 8 and is unconstitutional to the extent that it requires payment from lottery proceeds in excess of the total debt service allowable under the provisions of the amendment. I respectfully dissent to the majority's resolution of the first interrogatory and would answer that question in the negative.

### III.

The governor's second interrogatory concerns the allocation of monies saved by virtue of the 1992 refunding.[8] For reasons I will briefly explain below, any savings attributable to the 1992 refunding occur outside of the "window," and thus are not allocable to the GOCO Fund. Therefore, though our analyses differ slightly, I concur in the majority's determination that any savings from the 1992 refunding may accrue to the Capital Construction Fund and that Interrogatory No. Two should be answered in the negative. Maj. op. at 541.

To answer the second interrogatory, I must first address the validity of the portion of the 1992 refunding that shifted principal payments that were to become due after the closing of the "window" so that they would become due during the "window" period, and provided for payment of these principal obli-

gations with lottery proceeds. Although debt service on refunding obligations cannot exceed the total debt service cap established by section 3(1)(a)(II), the language of Amendment 8 does not suggest any further limitation on the right to refund. The Attorney General argues that, in addition to the cap restraint, the state is prohibited from altering the interest-principal mix of the debt service—*i.e.,* increasing the amount of principal and decreasing the amount of interest due within the "window." Such a limitation, however, is not present in the plain language of Amendment 8. Under section 3(1)(a)(II), refunding is permitted and debt service on "such refunding obligation[s]" is payable from net lottery proceeds. As long as the cap amount is not exceeded, the state has the flexibility to structure the makeup of the debt service on the listed obligations for repayment within the "window" in any manner it wishes. Thus, I would not hold the state's acceleration of principal payments into the "window" to be a violation of Amendment 8 if such restructuring were otherwise to comply with the limit on total debt service.

The preceding interpretation logically requires the conclusion that the 1992 refunding produced no savings of lottery proceeds. Amendment 8 sets a cap on the total amount of debt service payable from lottery proceeds. However, the amendment does not limit the state's ability to restructure the portions of this eligible debt service attributable to principal and interest, respectively, provided the total debt service does not exceed the cap amount. Thus, the state's acceleration of future principal payments in the 1992 refunding and the use of lottery proceeds to make such payments is consistent with Amendment 8 so long as the total debt service payments from lottery proceeds during the "window" do not exceed the debt service cap. As a logical corollary, invalidation of payments of lottery proceeds in ex-

---

8. Interrogatory No. Two was submitted in the following form:

   Whether savings from the 1992 refunding of certain obligations described in Amendment 8 can accrue to the benefit of the Capital Development Fund, instead of the Great Outdoors

Colorado Trust Fund established by Amendment 8, without violating Amendment 8.

   In accord with the majority, maj. op. at 535 n.1, I take the reference to the "Capital Development Fund" to refer to the Capital Construction Fund created in § 24–75–302, 10B C.R.S. (1995 Supp.).

cess of the debt service cap during the "window" does not prevent the expenditure of the full amount of lottery proceeds available under the debt service cap.

In accord with this interpretation, the 1992 refunding merely resulted in the allocation of the same amount of lottery proceeds to the repayment of capital construction obligations as would have been allocated in the absence of the refunding. The only savings attributable to this refunding are in the form of shorter debt service obligation periods—*i.e.*, the reduction in total payments that will have to be made to satisfy an obligation, with the concomitant reductions in total interest to be paid and the time necessary to satisfy the obligation. These savings will be realized after the "window" has closed. The state was not required to reduce debt service equally both within and outside of the "window" period. Therefore, any savings accruing as a result of the 1992 refunding are not savings of lottery proceeds and need not be returned to the GOCO Fund. Accordingly, I concur in the majority's determination that these savings may accrue to the benefit of the Capital Construction Fund.

## IV.

The third interrogatory concerns the constitutionality of the General Assembly's decision to delay the $6,000,000 final payment on the Colorado Convention Center obligation to allow it to be paid from lottery proceeds.[9] The majority upholds the General Assembly's action, finding the relevant provisions of Amendment 8 ambiguous and attributing to the people of Colorado an intent that this obligation was to be paid from lottery proceeds. I discover no such ambiguity in the amendment and follow the rule that the plain language of a constitutional provision is the best measure of the voters' intent. *People ex rel. Carlson, Governor v. City Council of Denver*, 60 Colo. 370, 377, 153 P. 690, 692 (1915) ("[W]hen [the] language [of a constitutional provision] is explicit, the courts are

bound to seek for the intention in the words of the provision itself, and they are not to suppose or hold that the people intended anything different from what the meaning of the language employed imports."); *see also In re Proposed Initiative on Water Rights*, 877 P.2d 321, 327 (Colo.1994) ("[W]hen courts construe a constitutional amendment that has been passed through a ballot initiative, any intent of the proponents not adequately expressed in the language of the measure will not govern that construction."). Furthermore, even if the delayed payment were permissible, it must be accounted for within the cap on total debt service, and available lottery proceeds for future repayments of capital construction obligations would necessarily decrease by $6,000,000. Accordingly, I respectfully dissent and would answer Interrogatory No. Three in the affirmative.

## A.

The state participated in the construction of the Colorado Convention Center by agreeing to contribute $36,000,000 over a period of years. Under the documents governing the terms of the contribution, a contract between the state and the City and County of Denver and section 24–83–102, 10B C.R.S. (1988), the final payment on this obligation was due on July 1, 1993, two months prior to the inception of the "window" for repayment from lottery proceeds established in Amendment 8. In 1993, following the adoption of Amendment 8 by the voters, the General Assembly enacted section 33–60–103(1)(b), 14 C.R.S. (1995), which allowed the final Convention Center payment to be made on September 1, 1993, a date within the Amendment 8 "window" period. This action resulted in the allocation of $6,000,000 in lottery proceeds to a capital construction obligation not previously payable with these proceeds, and thus violated the plain language of Amendment 8.

Subject to the explicit restrictions within Amendment 8, section 3(1)(c)(I) identifies a limited number of obligations potentially pay-

---

9. Interrogatory No. Three was submitted in the following form:

Whether the last installment payment made under the contract between the State of Colorado and the City and County of Denver concerning

the Colorado Convention Center, which was originally scheduled for July 1, 1993 and was postponed to September 1, 1993 pursuant to Colo. Rev.Stat. § 33–60–103(1)(b) (1993), violates Amendment 8.

able from lottery proceeds. Among these listed obligations is the Colorado Convention Center contract with the City and County of Denver. Colo. Const. art. XXVII, § 3(1)(c)(I)(C). However, contrary to the result adopted by the majority, *see* maj. op. at 541–42, neither the Convention Center obligation nor the other listed obligations automatically became payable from lottery proceeds solely as a result of their inclusion in this statutory list.

Amendment 8 expressly limits payment from lottery proceeds on the listed obligations "to the extent allowed in Section 3(1)(a) above." Colo. Const. art. XXVII, § 3(1)(c)(I). As discussed in part II, *supra*, section 3(1)(a)(II) limits the debt service that may be paid with lottery proceeds to monies due on the listed obligations during the "window"—*i.e.*, from September 1, 1993, through November 1, 1998—according to the documents originating the obligations. For the Convention Center obligation, the originating document is the contract with the City and County of Denver specifically identified in section 3(1)(c)(I)(C), and the contract's status as the originating document was not affected by the enactment of section 33–60–103. Under this contract, the final payment on the obligation was to be made on July 1, 1993, outside of the applicable "window." Consequently, no payments on the Convention Center obligation were scheduled to come due during the "window" period and payment of debt service on this obligation is not "allowed" under section 3(1)(a). Because section 3(1)(c)(I) expressly states the intent of the people to apply lottery proceeds to the Convention Center obligation only to the extent allowed under section 3(1)(a), debt service on this obligation cannot be paid from lottery proceeds.[10] *See Civil Serv. Employ-*

*ees Ass'n.*, 167 Colo. at 447, 448 P.2d at 628 ("An amendment to the constitution is the solemn final exercise of the sovereignty which belongs to the People of the State of Colorado. Neither executive order, nor legislative enactment, nor judicial decision can be permitted to render futile this expressed will of the People.").

This plain reading of Amendment 8 is further supported by section 3(1)(e), which states in pertinent part: "Debt service payable prior to September 1, 1993, according to the terms of the documents originating such obligations shall not be paid from Net Proceeds allocated pursuant to this Article." Colo. Const. art. XXVII, § 3(1)(e). This provision expressly excludes the final Convention Center payment, scheduled for July 1, 1993, from payment with lottery proceeds.

The language of Amendment 8 regarding the payment of the Convention Center obligation is clear and must be enforced as written. *Bolt v. Arapahoe County Sch. Dist. Number Six*, 898 P.2d 525, 532 (Colo.1995); *Dempsey*, 825 P.2d at 51. The General Assembly may not enact a statute that flies in the face of the clear meaning of a constitutional provision. *Colorado Ass'n of Pub. Employees*, 677 P.2d at 1353 (citing *Mauff v. People*, 52 Colo. 562, 123 P. 101 (1912)). Here, section 33–60–103(1)(b) constitutes a clear attempt to allow payment of the Convention Center obligation from lottery proceeds in contravention of the constitutional restrictions present in Amendment 8. Thus, I would hold that payment of the final Convention Center payment is not permissible under the terms of the amendment and that section 33–60–103(1)(b), 14 C.R.S. (1995), is therefore unconstitutional.[11]

---

**10.** The majority dismisses this plain reading as an overly "technical" construction of the language of Amendment 8. *See* maj. op. at 541, 542. However, such a characterization of the debt service "window" and payment restrictions fails to recognize and give effect to the core importance of these provisions in the allocation framework established by Amendment 8.

**11.** I recognize that this facial interpretation raises questions as to why the drafters included the Convention Center obligation among the obligations listed in Amendment 8. David L. Harrison, who acted as chairman of the citizens orga-

nization that drafted Amendment 8, filed a brief in this matter suggesting that the drafters erroneously believed that payments on the Convention Center were scheduled to come due within the "window" and that they would not have listed the obligation had they known it was scheduled to be paid in full before the "window" opened. A countervailing possibility is that the Convention Center obligation was listed, despite being facially excluded from repayment using lottery proceeds, to allow it to be rescheduled or refunded pursuant to section 3(1)(a)(II) for repayment within the "window." In the absence of any

## B.

However, even if the majority were correct in its determination that satisfaction of the final Convention Center payment from lottery proceeds was permitted under the provisions of Amendment 8, the General Assembly's action remains subject to the total debt service cap set forth in section 3(1)(a)(II). As discussed in part II, *supra*, Amendment 8 creates a cap on the total amount of debt service payable on capital construction obligations from lottery proceeds. This cap is calculated based on the debt service payable during the "window" according to the documents originating these obligations. As explained in the preceding paragraph, the contract with the City and County of Denver that originated the Convention Center obligation provided that no payments were due on that obligation during the "window." Whether permissible or not, the General Assembly's enactment of section 33–60–103(1)(b) did not change the status of the Denver contract as the document originating the Convention Center obligation. Therefore, the debt service cap amount, calculated as $163,323,746.14 by the Attorney General, did not include the $6,000,000 final payment on the Convention Center obligation. Thus, if the state makes this $6,000,000 payment and also follows through with its intention, embodied in section 33–60–103(1)(c), 14 C.R.S. (1995), to pay other eligible obligations from lottery proceeds up to the cap amount, the cap will be exceeded by $6,000,000. Accordingly, if the General Assembly's decision to move this payment within the "window" is approved, the state must forgo future debt payments from lottery proceeds in the amount of $6,000,000 in order to re- main within the constitutional cap on total debt service payable from lottery proceeds.

## V.

For the reasons set forth above, I concur in the majority's answer to the second interrogatory but respectfully dissent to its determinations with respect to the first and third interrogatories. Accordingly, I would respond to the submitted interrogatories as follows:

*Interrogatory No. One:*

No. Payment of the 1992 refunding obligations pursuant to section 33–60–103(1)(c), 14 C.R.S. (1993), is unconstitutional to the extent that the payments required to be made from lottery proceeds exceed the amount of total debt service payable set forth in section 3(1)(a)(II) of Amendment 8.

*Interrogatory No. Two:*

Yes. Savings generated by reason of the 1992 refunding can accrue to benefit of the Capital Development Fund.

*Interrogatory No. Three:*

Yes. Payment of the last installment payment on the Colorado Convention Center from lottery proceeds violated Amendment 8.

SCOTT, J., joins in this concurrence and dissent.

---

clear evidence of drafting intent, I would interpret the language as written. However, even applying the majority's "construction" that the inclusion of the Convention Center obligation must be given effect, payment of debt service on the rescheduled obligation may be made from lottery proceeds only if the state complies with the restrictions established in Amendment 8, including the cap on total debt service payable from lottery proceeds. *See infra* part IV(B).